UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff-Appellee,<br><br>    vs.<br><br>WILLIAM RICHARD NIELSEN,<br><br>        Defendant-Appellant. | No. 11-30189<br><br>D.C.No.9:11-cr-00008-DWM-1<br>U.S. District Court for<br>Montana, Missoula |

Taken at the Russell Smith Courthouse
Missoula, Montana
Tuesday, July 19th, 2011 at 10:32 a.m.


TRANSCRIPT OF APPEAL
Pages 1-106


Heard before the Honorable Donald W. Molloy
United States District Judge
District of Montana


A P P E A R A N C E S

CYNDEE L. PETERSON, Assistant United States Attorney, of
the Office of the United States Attorney, 105 East Pine
Street, Missoula, Montana 59801,
      appearing on behalf of the Plaintiff-Appellee.

MICHAEL DONAHOE, Esq., of the Federal Defenders of
Montana, 50 West 14th Street, Suite 300, P.O. Box 250,
Helena, Montana 59624,
      appearing on behalf of the Defendant-Appellant.


Reported by Julie M. Lake, RDR, CRR, CSR
Registered Diplomate Reporter
Certified Realtime Reporter

Proceedings recorded by mechanical stenography,
Transcript produced by computer.

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     vs.<br><br>WILLIAM RICHARD NIELSEN<br><br>              Defendant. | D.C. No. 9:11-cr-00008-DWM-1 |

Taken at the Russell Smith Courthouse
Missoula, Montana
Tuesday, July 19, 2011 at 10:32 a.m.

**TRANSCRIPT OF SENTENCING**

Heard before the Honorable Donald W. Molloy
United States District Judge

A P P E A R A N C E S

CYNDEE L. PETERSON, Assistant United States Attorney, of
United States Attorney's Office, 105 East Pine Street,
Missoula, Montana 59801,
     appearing on behalf of the Plaintiff.

MICHAEL DONAHOE, Esq., of Federal Defenders of Montana,
50 West 14th Street, Suite 300, P.O. Box 250, Helena,
Montana 59624,
     appearing on behalf of the Defendant.

Reported by Julie M. Lake, RDR, CRR, CSR
Registered Diplomate Reporter
Certified Realtime Reporter

Proceedings recorded by mechanical stenography,
Transcript produced by computer.

```
 1                      I N D E X

 2   WITNESS:                                    PAGE:

 3     GOVERNMENT WITNESSES:

 4     MATTHEW J. SALACINSKI

 5   Direct Examination by Ms. Peterson.................   7
     Cross-Examination by Mr. Donahoe..................  13
 6
       MONTE SHAIDE
 7
     Direct Examination by Ms. Peterson................  21
 8   Cross-Examination by Mr. Donahoe..................  27

 9     DEFENSE WITNESSES:

10     WILLIAM R. NIELSEN

11   Direct Examination by Mr. Donahoe.................  32
     Cross-Examination by Ms. Peterson.................  35
12
       MARTIN WHITE
13
     Direct Examination by Mr. Donahoe.................  39
14   Cross-Examination by Ms. Peterson.................  42
     Redirect Examination by Mr. Donahoe...............  43
15
       BETSY ANDERSON
16
     Direct Examination by Mr. Donahoe.................  45
17   Cross-Examination by Ms. Peterson.................  49

18
     EXHIBITS: None
19

20

21

22     Certificate of Court Reporter.................. 107

23

24

25
```

TUESDAY, JULY 19, 2011

**BE IT REMEMBERED** that on Tuesday, July 19, 2011, at 10:32 a.m., in the Russell Smith Courthouse, Missoula, Montana, before the Honorable Donald W. Molloy, United States District Judge, the following proceedings were had:

(Whereupon, the following proceedings were held in open court with counsel present and the Defendant present.)

THE COURT:  Call the next matter on the calendar, please.

THE CLERK:  This is the time set for sentencing in CR 11-8-M-DWM, United States of America vs. William Richard Nielsen.

THE COURT:  Ms. Peterson, have you read the Presentence Investigation Report?

MS. PETERSON:  Yes, Your Honor.

THE COURT:  Do you have any objections to it?

MS. PETERSON:  No, Your Honor.

THE COURT:  Are you going to move for the one-level reduction for the acceptance of responsibility under 3E1.1B?

MS. PETERSON:  Yes, Your Honor.

THE COURT:  You indicated that you had witnesses you intended to call this morning; is that correct?

MS. PETERSON:  That's correct, Your Honor.

THE COURT:  Are you still intending to call them?

MS. PETERSON:  I do, Your Honor.

1        THE COURT:  And is there--is the child victim here?

2        MS. PETERSON:  She's not, Your Honor.  Her parents

3   are both present.

4        THE COURT:  And do they intend to speak?

5        MS. PETERSON:  Yes, Your Honor.

6        THE COURT:  What are their names?

7        MS. PETERSON:  Jeff and Bobbi Jo.

8        THE COURT:  All right, thank you.

9        Mr. Donahoe, good morning.

10       MR. DONAHOE:  Good morning, Your Honor.

11       THE COURT:  Have you read the Presentence

12   Investigation Report?

13       MR. DONAHOE:  I have.

14       THE COURT:  Has William Richard Nielsen read the

15   Presentence Investigation Report in its entirety?

16       MR. DONAHOE:  He has.

17       THE COURT:  Have you discussed it thoroughly with

18   him?

19       MR. DONAHOE:  Yes.

20       THE COURT:  I know you have some objections, but I

21   think, unless you have some other idea or Ms. Peterson does,

22   perhaps the best way to proceed right now would be to let her

23   call her witnesses and then we can have whatever arguments

24   might stem from that proof.

25            There are some of your objections, though, that I

SALACINSKI, MATT

1   assume they have been worked out with the Probation Office.  Is

2   that right?

3           MR. DONAHOE:  Well, the process was a little

4   truncated because of the holiday.  You know, I tried to pare

5   that down when I got to the memo phase.  But I can address

6   those things when I talk to Your Honor about that.

7           THE COURT:  Why don't we have Ms. Peterson call her

8   first witness.

9           MS. PETERSON:  Yes, Your Honor.  The Government

10  calls Agent Matt Salacinski.

11          THE COURT:  Would you step up in front of the clerk,

12  please.  Raise your right hand and be sworn.

13      (MATTHEW J. SALACINSKI sworn in.)

14          THE COURT:  Have a seat over here, if you would,

15  please.

16          For the record, would you state your full name and,

17  for the benefit of the court reporter, spell your last name.

18          THE WITNESS:  Matthew J. Salacinski.

19  S-A-L-A-C-I-N-S-K-I.

20          THE COURT:  And, Mr. Salacinski, what is your

21  profession?

22          THE WITNESS:  I'm currently employed as a Special

23  Agent with the Federal Bureau of Investigation.  My current

24  assignment is digital forensic examiner.

25          THE COURT:  And what city do you live in?

1              THE WITNESS:  Billings, Montana.

2              THE COURT:  Ms. Peterson.

3              MS. PETERSON:  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    BY MS. PETERSON:

6    Q.    Agent Salacinski, how many years of involvement do you

7    have with computer forensic examination?

8    A.    I've been running the digital forensics lab in Billings,

9    Montana since early 2005.

10             MS. PETERSON:  Your Honor, may I ask if the

11   Defendant will stipulate to Agent Salacinski's expertise in

12   this area?

13             THE COURT:  I guess you can ask.

14             MR. DONAHOE:  I will.

15             THE COURT:  I'm sorry?

16             MR. DONAHOE:  I will.  I agree.

17             THE COURT:  All right.  Then, the agent will be

18   accepted as an expert in the area of digital forensics.

19             MS. PETERSON:  Thank you, Your Honor.

20   Q.    (By Ms. Peterson)  Agent Salacinski, are you familiar

21   with the definition of a computer that's set forth in 18 U.S.C.

22   1030(e)(1)?

23   A.    I am, as I reviewed it recently.

24   Q.    And are you--do you also have some training and

25   background and have some experience with regard to cellular

SALACINSKI, MATT

1    phones?

2    A.    I do.

3    Q.    I would like to break down the definition a little bit

4    and I'm going to ask you questions as I break it down.

5         So starting at the first part of that definition

6    that states that computers mean an electronic, magnetic,

7    optical, electrochemical or other high-speed data processing

8    device performing logical or arithmetic functions.

9         Would a cellular phone fit into that definition?

10   A.    It does.

11   Q.    And can you please explain to the Court why.

12   A.    Cellular phones, at their core, perform a lot of

13   arithmetic and logical functions just in their basic operation.

14   For instance, in storing files, pictures, contacts, receive

15   calls.  When this data is placed on the device, the device has

16   to have the means of determining whether there is enough

17   storage available, so arithmetic operations are performed to

18   determine the amount of data that needs to be stored and

19   whether there is enough area in unallocated storage.

20        THE COURT:  Let's focus in on the phone that he had,

21   so we're not talking in generalities.

22        MS. PETERSON:  Your Honor, the problem that will

23   come out with Agent Shaide's testimony is that the Defendant

24   lost the particular phone that was used in this case, so we do

25   not have the specific phone.

1          What will be presented through Agent Shaide is that

2     the Defendant admitted to making calls, he admitted to sexting,

3     and the phone was also used to take photographs.  So that's why

4     I'm unable to direct Agent Salacinski to a specific make and

5     model of the cellular phone.

6          THE COURT:  All right.

7     Q.    (By Ms. Peterson)  I'm sorry, were you finished?

8     A.    So, you know, in summary fashion, the device, because it

9     stores information, needs to perform logical and math

10    operations in order to determine whether there is enough

11    storage available.

12          Also, nearly all cell phones these days have the

13    ability to lock somebody out, so there is a password function.

14    Password functions require math operations in order to perform

15    their underlying logical operations:  Whether or not you enter

16    the correct password, for instance, so that the device will let

17    you in to use it.

18    Q.    Continuing on then with that definition.  Other

19    high-speed data processing device that performs storage

20    functions and includes any data storage facility.

21          Again, would a cellular phone meet that function?

22    A.    It does, much in the same sense that what people would

23    normally associate with their common desktop computer.  Cell

24    phones have several levels of data storage.

25          When you first turn the device on, in order for the

SALACINSKI, MATT

1   device to operate, the keyboard, the screen--or the display, I

2   should say, sound, tiny little programs need to be stored on

3   the device so that these things can operate once the device is

4   turned on.  So those--those things are stored on the phone much

5   in the same manner that when you turn on a computer, the

6   keyboard, sound card, the display functions without you having

7   to do anything other than having to stand there while the

8   computer boots up.

9           Secondly, phones store information, as do computers

10  or other digital devices, in that you can stick micro SD cards

11  in them.  They have USB, universal serial bus, interfaces for

12  data storage.  And, in fact, you can remove SD cards from cell

13  phones, place them in computers, and vice versa.  So they have

14  the ability to address removable storage.

15          They also have--most these days have built-in or

16  pre-manufactured onboard storage so you can store text

17  messages, pictures, movies, music on the device itself.  So it

18  functions in the same manner.

19  Q.    Would any cell phone that had the ability to text have

20  the storage capability?

21  A.    Yes.  I mean, without regard to what--on what level the

22  phone stores the text message, the storage capability is there,

23  whether it's a removable or it's straight onto the main circuit

24  board of the device.

25  Q.    Then finishing out that definition, the last portion

11

SALACINSKI, MATT

1    says, "Or communications facility directly related to or

2    operating in conjunction with such device."

3              Does the cellular phone meet the latter part of that

4    definition?

5    A.    It does.

6    Q.    Again, can you explain why?

7    A.    Cell phones, just like computers, are, especially these

8    days, devices that are designed to be members of networks.

9              When a cell phone accesses the cellular telephone

10   network, it's doing so for the purpose of communicating with

11   some predefined set of protocols to make a telephone call to

12   another cell phone that is on the network.  Okay, and that does

13   not--to another--I should say to another telephone that is on

14   the publicly switched telephone network.

15             So if you are going to call a landline, a desktop

16   computer or another cell phone, you are accessing, with your

17   cell phone, a network that is then designed to communicate with

18   other clients on the network.  Computers do the same thing when

19   they text to other computers or when they send text messages to

20   cell phones or when they simply access a website on the

21   Internet.

22   Q.    With regards to the specific cell phone forensic

23   examination in this case, was anything found on the victim's

24   phone that indicated any kind of web involvement from the

25   victim and the Defendant's phone that was used?

SALACINSKI, MATT

1    A.     When the cell phone was examined by Detective Woog in my

2    laboratory, a number of photographs were taken of the screens

3    on the phone.  And one of those--I should say a series of

4    photographs that were captured were of authentication or what

5    we would commonly refer to as log-in screens and through--for

6    web access.  So those pictures were taken and the--the phone

7    had clearly been used to access some web content wherein a user

8    name and an ID--I'm sorry, the user name and a password was

9    required.

10   Q.     And that was from the victim's cell phone that she was

11   actually accessing the web using a user ID, correct?

12   A.     That's correct.

13   Q.     And was there any indication of what was on the other

14   side, what text she was connecting to or whether or not that

15   individual accessed the web?

16   A.     There was a--okay, that's two questions.

17          Number one, there was a capture of an incoming item

18   that was posted from a William, and it was a short message

19   there.  So after that log-in process took place, that message

20   was received and stored locally on the phone, on the device.

21   Okay?

22          As far as how that message--the sender of that

23   message, there are a number of ways that can get there.  I

24   can't speak to that in particular.

25          MS. PETERSON:  No other questions, Your Honor.

1        THE COURT:  Cross-examination?

2        MR. DONAHOE:  Thank you.

3                    CROSS-EXAMINATION

4   BY MR. DONAHOE:

5    Q.    I guess we'll go backwards.  Did the message come from

6   his phone?

7    A.    I can't tell you if it came from his phone.  It was

8   identified as from William.  That's as much as I can say.

9    Q.    So did it come from his phone?  Do you know that

10  categorically?

11   A.    No.

12   Q.    No, you do not.  And you didn't examine his phone, did

13  you?

14   A.    No.

15   Q.    How many types of cell phones are there on this planet,

16  as we speak?

17   A.    Hundreds, if not maybe more than a thousand.

18   Q.    With a variety of sponsors or manufacturers; wouldn't

19  that be true?

20   A.    That's absolutely true.

21   Q.    And they all have different capabilities, don't they?

22   A.    They do.

23   Q.    Is a person--is your testimony that a person is using a

24  cell phone as a computer when he's talking on it?

25   A.    He's using the device in the same manner that one can

SALACINSKI, MATT

1   use a computer.

2   Q.    That's not the question.  Is he using it as a computer?

3   A.    I think he is.

4   Q.    All right.  And what's the basis for that conclusion?

5   A.    Okay, because he's talking on a network enabled device

6   on a network, communicating with another device on the network.

7   Q.    So it was an interactive computer?  It's an interactive

8   computer device when one makes a call?

9   A.    Yes, it is.

10  Q.    And in the specifics here, what evidence do you have to

11  show that the computer was accessed, and what computer are we

12  talking about?

13  A.    I'm sorry, I don't understand the question.

14  Q.    All right.  Apparently you have cell phone sender, cell

15  phone receiver.

16  A.    Yes.

17  Q.    And these cell phones, sender goes through a computer

18  service and comes out and goes to receiver.  Is that the gist

19  of it?

20  A.    It accesses a network.  And the problem I have with your

21  question is the computer service.  It's a device that accesses

22  a network using a predefined protocol as any computer--as any

23  computer device were if it were network capable.

24  Q.    But the service is the computer.  The network is the

25  computer, is it not?

SALACINSKI, MATT

1    A.    No, sir.  The network is a conglomeration of routers and

2    switches and cell phone towers and landlines that connect all

3    these devices together, physically routing using certain

4    protocols--we'll just call it firmware/software--that allow

5    them to talk to one another over the physical network.

6    Q.    So is it your testimony that those towers and switches

7    and so on, that has nothing to do with computers?

8    A.    No, they are computers.  They are the network themselves

9    that the device is--computing devices can access one another

10   using the network.  They are members of the network.

11         Does that answer your question?

12   Q.    Not really.

13         So was this computer--this cell phone, assuming for

14   sake of discussion that these calls were made, acting as a

15   computer?  Was it storing data while they were talking?

16   A.    Yes, it was.  It was recording--I mean, okay, I did not

17   examine his phone.  We're talking about these devices

18   generically here.

19   Q.    Yes.

20   A.    They keep track of the length of the call, to whom the

21   call was made, that sort of thing.  So they store metadata

22   about the communications and then--so, yeah, data is being

23   stored, in addition to using the device as a communication

24   device as well.

25   Q.    But there is no way that what is being stored is going

SALACINSKI, MATT

1    to tell you what the content of that conversation is.

2    A.     Not if it was a voice communication.

3    Q.     Correct.

4    A.     Unless the user had set the phone up to be used in that

5    case, but I don't think that that's the underlying premise of

6    your question.

7    Q.     But we don't have that here, do we?

8    A.     I don't think we do, but I don't know what his--I've

9    never seen his phone.

10   Q.     So beyond the metadata, there was nothing of a voice

11   nature that was captured by this cell phone when these calls

12   were being made.  Correct?

13   A.     Which cell phone?

14   Q.     Either cell phone.

15   A.     His, I don't know.  Hers, no.

16   Q.     Now, let's--same set of questions but for texting.

17   A.     Okay.

18   Q.     Is the answer different?

19   A.     No.  Well, okay.  Which set--could you start out--just

20   get me started on a question.  I don't know which question I'm

21   answering.

22   Q.     Well, I think we've established, have we not, that no

23   voice data was captured, probably, between these two parties,

24   assuming that they spoke.

25   A.     Correct.

1  Q.    All right.  With the exception of the metadata.

2  A.    Correct.

3  Q.    Time of call, length of call, that sort of thing.

4  A.    That's correct.

5  Q.    Now, with texting, would the answer change in terms of

6  content?

7  A.    Yes, it would.

8  Q.    It would, wouldn't it?  Why?

9  A.    Generically speaking, phones capture both incoming and

10  outgoing text messages and the party to whom the message was

11  sent, the device the message was sent to, to include date and

12  time of transmission.

13  Q.    So just as an illustration, I live in Helena and on my

14  way over here today I had two texts from my wife and I cleared

15  up some family business for the day.  Now, if I open my phone

16  and looked at it, that correspondence would be in there,

17  wouldn't it?

18  A.    If your phone is set up for that, yes, sir.

19  Q.    Sure.  And you could look at it if you wanted to, if I

20  wanted to show it to you.  Correct?

21  A.    Correct.

22  Q.    And I could save those things.  I could probably

23  download them and put them on a computer, couldn't I?

24  A.    If you have the software to interface with the phone,

25  you can.

1    Q.    Okay.  Now, given the difference between the noncapture

2    of the voice and the capture of the text, and for relevance of

3    the issue that's before the Court here, can you tell me whether

4    the inducement, the enticement, the coercion was conducted in

5    this case through voice or through text?

6    A.    I did not--I didn't conduct the investigation.  I read

7    the case file, but I don't know the nature of the

8    communications between the victim and the suspect in this case,

9    other than I know cell phones were involved and that one of

10   those phones--at least one of those phones ended up in my

11   laboratory.

12   Q.    I have nothing further.  Thanks.

13         THE COURT:  Any redirect?

14         MS. PETERSON:  No, Your Honor.

15         THE COURT:  What's the difference between the way a

16   cell phone works and the way Skype works?

17   A.    Skype, they are both acting as communication devices.

18   Skype, when you access the Internet if you are doing it, say,

19   from your computer, Your Honor, you are accessing, say, a

20   wireless network or a cable network, in essence the physical

21   mode of access to the network is out over either Ethernet or

22   what we call an 80211 signal, commonly known as a wireless

23   signal.  On top of that physical signal your voice and your

24   picture are riding out.

25         On the cell phone--let's say I have an iPhone, and

SALACINSKI, MATT

1   the iPhone camera is looking at me and I'm essentially doing

2   what Skype does.  The physical signal that my picture and my

3   video are riding out onto the network on, it's over a different

4   flavor or type of radio signal, but it's a radio signal

5   nonetheless.

6            So what it really comes down to is communication

7   protocol, the way they are designed.  One is with a different

8   set of rules over a wire.  Another is a different set of rules

9   over a radio signal.

10           THE COURT:  But do the devices themselves process

11  information and go through protocols relatively in a similar

12  fashion?

13   A.    They do, in that the video and the voice are carried by

14  packets that are processed and transmitted over the network

15  from device to device.  They are identical in that fashion.

16           THE COURT:  So if you use the generic term

17  "computer," it describes both of them?

18   A.    I think it does.  You know, many times, especially these

19  days, we get tied up--or we get hung up on a form factor.  One

20  sits on my desk or sits on my lap, the other is a hand-held

21  device.

22           But to be honest with you, because they both have an

23  operating system and storage and they both function

24  arithmetically and logically in much the same manner, the form

25  is really not the issue as much as it is the function, the

SHAIDE, MONTE

```
1    operating system and the way the device is designed to operate

2    on a network.

3              THE COURT:  All right.  Any follow-up?

4              MS. PETERSON:  No, Your Honor.

5              MR. DONAHOE:  Nothing.

6              THE COURT:  All right.  Thank you.  You may step

7    down.

8              Do you have any other witnesses?

9              MS. PETERSON:  Yes, Your Honor.  The Government

10   calls Agent Monte Shaide.

11             THE COURT:  Would you step up, raise your right hand

12   and be sworn, please.

13         (MONTE SHAIDE sworn in.)

14             THE COURT:  Have a seat right over here.  For the

15   record, would you state your name and spell your last name.

16             THE WITNESS:  Monte Shaide.  S-H-A-I-D-E.

17             THE COURT:  And, Mr. Shaide, what is your

18   profession?

19             THE WITNESS:  I'm a special agent with the Federal

20   Bureau of Investigation.

21             THE COURT:  Where is your duty station?

22             THE WITNESS:  My current duty station is the

23   Missoula Resident Agency in Missoula, Montana.

24             THE COURT:  Ms. Peterson.

25             MS. PETERSON:  Thank you, Your Honor.
```

SHAIDE, MONTE

1          <u>DIRECT EXAMINATION</u>

2    <u>BY MS. PETERSON:</u>

3    Q.    Agent Shaide, were you involved with the investigation

4    against the Defendant, William Nielsen?

5    A.    Yes, I was.

6    Q.    Are you familiar with all of the reports and the

7    background information?

8    A.    Yes, I am.

9    Q.    Did the--strike that.

10          During the investigation was the Defendant

11   interviewed?

12   A.    Yes, he was.

13   Q.    And was the victim interviewed?

14   A.    Yes, she was.

15   Q.    Did you determine that there was communication between

16   the two of them via cell phones?

17   A.    Yes.

18   Q.    And did they both admit that they called each other

19   utilizing their cell phones?

20   A.    Yes.

21   Q.    Did they both admit that they texted each other using

22   their cell phones?

23   A.    Yes.

24   Q.    And, in fact, they actually both admitted that they

25   engaged in phone sex as well, correct?

SHAIDE, MONTE

A.     Correct.

Q.     And that was while she was in Wyoming and he was in Missoula, Montana?

A.     Yes.

Q.     Did the phone that the Defendant used to call the victim in this case, was that phone ever recovered by the FBI?

A.     No, it was not.

Q.     And why was that?

A.     During the interview William stated that he had lost his phone two days prior to the 9th of January when he was apprehended.  And it was along a walk he said he took outside his apartment, which was two days prior.  So roughly around the 7th of January he stated he lost his phone.

Q.     During his interview did you also talk about specifics with regard to that phone that he used, the lost phone?

A.     Yes.

Q.     And did he talk at all about anyone taking photographs with that phone?

A.     Yes.

Q.     And what was that?

A.     He admitted he took some photographs of the victim with his phone, so that the phone was camera capable.  And also the victim admitted that she had pictures taken of her by the Defendant with the same phone.

Q.     Going specifically to the Defendant's interview and the

SHAIDE, MONTE

1    victim's interview.

2              Did you talk to them about their telephone

3    discussions before she traveled to the State of Montana?

4    A.    Yes.

5    Q.    And was it disclosed that the victim let the Defendant

6    know that she had somehow used drugs previously?

7    A.    Yes.

8    Q.    Was there any discussion about the use of drugs in

9    coming to Montana?

10   A.    Yes.

11   Q.    And what was that?

12   A.    It was the fact that the victim talked about her

13   likeness of marijuana, OxyContin, Percocet and other drugs.

14   She also had talked about drinking and partying.

15             She was a girl that was a little bit troubled and

16   had a family dispute going on with her mom and dad being

17   divorced.  Her dad works a lot.  She was at her dad's house for

18   a while and she was somewhat bored and looking for someone to

19   reach out to.

20   Q.    And this was all information that was relayed to the

21   Defendant?

22   A.    Yes.

23   Q.    Did they discuss the fact that she wasn't a virgin?

24   A.    I'm unaware of discussing the fact that she wasn't a

25   virgin, but she admitted that she wasn't a virgin in the

1    interview.

2    Q.    Was there any discussion that involved sex between the

3    two of them?

4    A.    Yes.  They both admitted that they had phone sex and

5    were sexting each other prior to their meeting.

6    Q.    Was there a discussion about how she would get to

7    Montana?

8    A.    Yes.

9    Q.    And what was that?

10   A.    She would have to get there by bus.

11   Q.    How about her age at the time?  What did you determine

12   in your interview with the Defendant based on the victim's age?

13   A.    Initially when they were in the chat room, which was

14   determined by the Defendant's interview possibly to be

15   Livelinks, that they were in there and she said initially she

16   was 18.

17             A few days prior to even getting on the bus, she had

18   told the Defendant she was actually 12, and the Defendant told

19   her he was a registered sex offender and it will be our little

20   secret.

21   Q.    At the time that the Defendant was initially arrested,

22   did he minimize his involvement in this crime?

23   A.    Yes.

24   Q.    Explain how that transpired up to the point where he

25   finally admitted his conduct.

1    A.    Initially he stated that he didn't know she was 12.  She

2    showed up and then he realized, after meeting her, she probably

3    wasn't as old as she looked but didn't really know her age.  To

4    the point where after the interview continued and he was

5    polygraphed, when I went in to interview him he admitted that,

6    *I was--I in fact knew she was 12 a few days prior before*

7    *coming.*  Initially he wouldn't admit that.

8    Q.    Did you get into some of the specifics of the

9    victimization that occurred after she arrived?

10   A.    Yes.

11   Q.    Can you describe that for the Court.

12   A.    The Defendant had her refer to him as daddy.  He

13   referred to her as his fuck pet.  They would go back and forth

14   engaging in sexual activity.  Oral and vaginal sexual activity.

15   Bondage.  The Defendant is in to bondage and that was kind of

16   his whole theme of things, is wanting to tie up, wanting to

17   choke out, do things of that nature.

18   Q.    Did he specifically talk to you about his reasons of why

19   he did not tie her up?

20   A.    Yes.  He stated that he didn't have enough rope.  And

21   when I asked him, *What do you mean by enough rope,* he goes,

22   *Well, every good bondage person knows that three feet of rope*

23   *will not tie a person up.  You need at least six feet.*

24        I asked him in more detail how he knew that and he

25   said, *Well, books and other research I've done.*

SHAIDE, MONTE

1   Q.    Did you talk to him about what his intention was with

2   regards to the victim, long-term intention?

3   A.    When I asked him, I said, *She knew you were a registered*

4   *sex offender.  You knew she was 12.  She's in your apartment.*

5   *She doesn't have ability to get out because you are bullying*

6   *her, keeping her there, telling her she's not going to leave.*

7   *She has no way to leave and is scared.*

8           I asked him, *Well, what was your intention?  What*

9   *were you planning on doing with this girl?*  And he said, *I*

10  *guess I'll have to fuck her until she's 18.*

11  Q.    And did you--excuse me, strike that.

12          Did you talk to him specifically about whether or

13  not he knew that it was wrong to use a phone to engage in

14  sexual conversations with a minor or to entice her to Montana?

15  A.    Yes.  He realized he was in trouble for soliciting

16  possible sexual intercourse with a minor and then possible

17  kidnapping, is how he put it in his words during the interview.

18  Q.    And the victim's physical state at the time that she was

19  found and then seen for medical, was it consistent with his

20  admissions on what he did to her?

21  A.    Yes.

22  Q.    And did he admit that he had slapped her and bit her?

23  A.    Yes.  He said he bit her lightly, choked her, slapped

24  her, and she had injuries that were conclusive to his actions.

25          MS. PETERSON:  I have no other questions, Your

SHAIDE, MONTE

1    Honor.

2              THE COURT:  Cross-examination?

3                      CROSS-EXAMINATION

4    BY MR. DONAHOE:

5    Q.    Sir, insofar as the communications are concerned, you

6    were satisfied, I guess, when you took the confession or the

7    statement from Mr. Nielsen that he had made this correspondence

8    over the phone.  Would that be fair enough to say?

9    A.    Yes.

10   Q.    With A.J.  And it came in two forms:  One was in

11   conversation apparently and some was in text.  True?

12   A.    Yes, my understanding.

13   Q.    Okay.  Did you ever differentiate between the two in

14   terms of content?

15   A.    I never differentiated between the two, other than his

16   statement and her statement involving the conversations.  The

17   text was--a search warrant was applied for the text and my

18   knowledge was we didn't have the text that would show between

19   the correspondence.

20   Q.    Okay.  So basically any inducement, enticement, would it

21   be a fair thing to say today, occurred in the conversation?

22   A.    Yes.  It could have occurred in conversation in the chat

23   room as well.

24   Q.    All right, but let's put that aside.  Maybe we can talk

25   about that.

SHAIDE, MONTE

1           But the inducement, at least for purposes of this

2     offense--you are an FBI agent, right?

3     A.     Yes.

4     Q.     You recognize this is a federal offense, right?

5     A.     Yes.

6     Q.     And the whole jurisdictional hook here is the use of the

7     cell phone essentially, right?

8     A.     Yes.

9     Q.     Okay.  So the conversation was the inducement, or the

10    coercion, or the persuasion.

11    A.     Yes.

12    Q.     Would that be fair enough to say today?

13    A.     Yes.

14    Q.     So we're not really relying on any textual material that

15    may have transpired between the two.

16    A.     No, If--

17    Q.     Okay.  You mentioned in your direct a little bit about

18    drugs.  Did you canvass or search the apartment for drugs?

19    A.     The search warrant was conducted locally by Missoula

20    Police Department.  And my understanding is, not from reading

21    the reports, I believe there was a little contraband found in

22    the apartment.

23    Q.     I thought you were conversant with all of the reports in

24    the case?

25    A.     Yes, I am.  I would have to read that report in front of

SHAIDE, MONTE

1   me as far as exactly what was located as far as any type of

2   drug material.

3   Q.    So you don't know today?

4   A.    I don't know today.

5   Q.    Something you can check?

6   A.    Something I probably could check.

7   Q.    Was there cocaine?

8   A.    No, there was no cocaine.

9   Q.    Was there marijuana?

10  A.    I believe there was some residue of marijuana.

11  Q.    Any alcohol?

12  A.    I believe we had some alcohol, a little bit.

13  Q.    Anything beyond that?

14  A.    Not to my knowledge.

15  Q.    Percocet?  Any kind of prescription drugs?  Anything

16  like that?

17  A.    I'm not certain of the prescription drugs that were

18  prescribed to William.

19  Q.    I take it you've been doing this work for a little

20  while.

21  A.    Yes.

22  Q.    Is it unusual for a suspect to minimize his involvement,

23  especially in the initial phases of an interrogation or taking

24  a statement from somebody?

25  A.    Yes.

1    Q.    It is?

2    A.    Yes.  You see a lot of people usually tend to minimize.

3  Subjects do initially.

4    Q.    They do initially.  So--and that's part of the process,

5  is staying with the suspect.  And you have training for that,

6  don't you?

7    A.    Absolutely.

8    Q.    Yeah.  And the whole point, which you were successful

9  here, is to bring the individual through the interview process,

10  to have some decent understanding and consistency between a

11  statement taken from your suspect and maybe other people

12  involved.  Right?

13   A.    Correct.

14   Q.    And did you achieve that here as a result of your

15  process?

16   A.    Yes.

17   Q.    And you were satisfied, in fact, that just prior to

18  A.J.'s departure for Montana, there was discussion that she was

19  12.

20   A.    Yes.

21   Q.    And, likewise, Mr. Nielsen's discussion or notice to

22  A.J. that he was a sex offender.  Right?

23   A.    Yes.

24   Q.    And that happened just prior to her departure, true?

25   A.    From both statements that I reviewed and one of the

SHAIDE, MONTE

1   statements I conducted with the Defendant, is approximately two

2   days before she departed she was aware he was a sex offender,

3   he was aware she was 12.

4    Q.    This might be an unfair question.  But do you know,

5   because I do, how long it took from initial Livelinks contact

6   to the police being in the apartment?

7    A.    No, I do not.

8    Q.    You do not, okay.

9          And one last thing.  Do you know how the trip was

10  financed?

11   A.    Yes.  The victim stated that she took money from her

12  mother's purse and purchased the bus ticket to the Missoula.

13   Q.    Now, was there any discussion in the statement taken

14  from Mr. Nielsen about him supplying money?

15   A.    Not to my knowledge.

16   Q.    Okay.  I have nothing further.  Thanks.

17          THE COURT:  Any redirect?

18          MS. PETERSON:  No, Your Honor, thank you.

19          THE COURT:  Thank you.  You can step down.

20          Any other witnesses?

21          MS. PETERSON:  No, Your Honor.

22          THE COURT:  Do you have any witnesses?

23          MR. DONAHOE:  I do.  I have three.

24          THE COURT:  What are your witnesses going to testify

25  about?

```
 1              MR. DONAHOE:  Well, I have--

 2              THE COURT:  Do they have anything to do with the

 3  issues that are--

 4              MR. DONAHOE:  The computer?

 5              THE COURT:  Yes.

 6              MR. DONAHOE:  Well, I have that and--

 7              THE COURT:  All right, call your first witness.

 8              MR. DONAHOE:  I would call Mr. Nielsen.

 9              THE COURT:  All right.  Would you raise your right

10  hand and be sworn.

11         (WILLIAM R. NIELSEN sworn in.)

12              THE COURT:  Have a seat right over here, please.

13  State your full name, please.

14              THE WITNESS:  William Richard Nielsen.

15              THE COURT:  Mr. Donahoe.

16                        DIRECT EXAMINATION

17  BY MR. DONAHOE:

18   Q.   Sir, you reviewed the Presentence Report in depth,

19  didn't you?

20   A.   Yes.

21   Q.   And we talked about it, didn't we?

22   A.   Yes.

23   Q.   Now, later in the process I gave you notice that there

24  was an impact statement that was submitted by A.J., didn't I?

25   A.   Yes.
```

NIELSEN, WILLIAM R.

1    Q.    And I read it to you verbatim, did I not?

2    A.    Yes.

3    Q.    So you are familiar with the content of that statement,

4    correct?

5    A.    Correct.

6    Q.    And I'm not going to read it or discuss it in open

7    court, but do you dispute that statement?

8    A.    Parts of it.

9    Q.    With respect to drug usage, can you tell me what drugs

10   were in your house or apartment?

11   A.    Two grams of medical marijuana, which I did have my card

12   for.

13   Q.    Was there any alcohol?

14   A.    Two small bottles that I was using to clean out the

15   holes where I had just had teeth pulled.

16   Q.    When you say small bottles?

17   A.    (Indicating.)

18   Q.    They were kind of like airplane size?

19   A.    Yeah.

20   Q.    What did they contain?

21   A.    One had Jack Daniels.  The other had rum.

22   Q.    Any other kind of drug substance?  Cocaine,

23   methamphetamine, Percocet?  Anything of that nature?

24   A.    No.

25   Q.    No drugs?

1   A.    (Witness shakes head.)

2         THE COURT:  You have to answer out loud.

3   A.    No, sir.

4   Q.    (By Mr. Donahoe)  Did you use the marijuana while A.J.

5   was at your apartment?

6   A.    Yes.

7   Q.    Did she use the marijuana?

8   A.    I didn't give it to her.

9   Q.    But did she use it?

10  A.    Yes.

11  Q.    Beyond that, are you aware of any other drugs that were

12  taken by A.J. while she was at your apartment?

13  A.    One Ibuprofen for a headache she said she had.

14  Q.    Beyond that, anything?

15  A.    No.

16  Q.    Did you, during the time that A.J. was at your

17  apartment, leave the apartment?

18  A.    Several hours each day.

19  Q.    For what purpose?

20  A.    School, helping out friends, grocery shopping, helping

21  out my family.

22  Q.    Did A.J. accompany you on those excursions?

23  A.    No.

24  Q.    Where did she stay?

25  A.    She stayed in the apartment, even though I did offer to

NIELSEN, WILLIAM R.

1   bring her along.

2   Q.     So she declined and would remain behind?

3   A.     Yes.

4   Q.     Did you lock her in the apartment?

5   A.     No.

6   Q.     How long would you be gone on these little excursions?

7   A.     Anywhere between five and eight hours.

8   Q.     Did you ever communicate with A.J. during those times

9   while you were absent?

10  A.     Until I lost my phone, she would send me a text, asking

11  when I would be back or if there was anything I could pick up

12  for her specifically food wise.

13  Q.     Did you keep her confined to the apartment?

14  A.     No.

15  Q.     I have nothing further.  Thanks.

16          THE COURT:  Cross-examination?

17                      CROSS-EXAMINATION

18  BY MS. PETERSON:

19  Q.     With regards to never locking the apartment, did the

20  victim ever leave the apartment?

21  A.     I asked if she wanted to go on walks or anything, or if

22  she wanted to go out on her own for a bit while I was out.  She

23  said no.

24  Q.     Did the victim ever leave your apartment?

25  A.     No.

NIELSEN, WILLIAM R.

1    Q.    And she was there for going on five days?

2    A.    The 5th through the 9th.

3    Q.    What clothes did she wear while she was in your

4    apartment?

5    A.    She had a jacket, T-shirt, bra, pants.  I washed her

6    clothes twice when I was doing my laundry, so she would borrow

7    one of my spare T-shirts and my swim trunks.

8    Q.    What did she generally have on when she was in your

9    apartment?

10          MR. DONAHOE:  Objection.  Exceeds the scope of

11    direct.

12          THE COURT:  Overruled.

13    A.    One of my T-shirts and nothing else.

14    Q.    (By Ms. Peterson) And isn't it true that when you were

15    interviewed by Monte Shaide, that you told him that a lot of

16    times she was naked, she didn't have any clothes on?

17    A.    When I was there, yeah.  I don't know about the times

18    when I was gone.

19    Q.    And you discussed partying and drugs with her over the

20    cell phone prior to her coming to Montana?

21    A.    When we were talking on Livelinks and before the

22    texting, yeah.

23    Q.    What did the texting entail?  What would you text back

24    and forth?

25          MR. DONAHOE:  Same objection.

1              THE COURT:  Overruled.

2    A.    The texting started out just how days were going,

3    general stuff like that.  One night I got a text from her

4    saying, *Have you ever had text sex or phone sex?*  I was like,

5    it's not--I sent back, *It's not something I'm in to, but we*

6    *could give it a whirl.*

7    Q.    Did you give it a whirl?

8    A.    Yeah.

9    Q.    Would you talk to her daily on your cell phone?

10   A.    I'd answer whenever she called, yeah.

11   Q.    And you told Agent Shaide in the interview that you knew

12   she was 12 approximately two to three days before she traveled

13   from Wyoming?

14   A.    Approximately.

15   Q.    While you were out running errands when the two of you

16   were both in Missoula, did she ever text you asking you to get

17   drugs?

18   A.    Several times, but I never had the money for them.

19   Q.    So money was the issue?

20   A.    Yes.

21   Q.    But you have a medical marijuana card, correct?

22   A.    Yeah.

23   Q.    And so the marijuana that you had in the house you

24   obtained for your medical purpose?

25   A.    Yes.

NIELSEN, WILLIAM R.

1    Q.    And you are saying that she used it without your

2    permission?

3    A.    Yes.

4    Q.    Did you--strike that.  When you were--when you were

5    engaged in your sexual contact with the victim, was it violent?

6    A.    I told her that I would stop whenever she said stop.

7    Q.    You told the 12-year-old victim that as long as she

8    controlled it, that you would keep being violent?  Yes?

9    A.    Yes.

10    Q.    And Agent Shaide testified that you slapped her and bit

11    her and at one point actually choked her when you were on top

12    of her.  Is that accurate?

13    A.    Yes.

14    Q.    Is his statement as to why she was not tied up accurate?

15    A.    Yes.

16    Q.    And you actually said that it was primarily because you

17    didn't have the money to go out and buy the six feet of rope,

18    that was the issue.

19    A.    Not on the rope.

20         MS. PETERSON:  I don't have any other questions,

21    Your Honor.

22         THE COURT:  Any follow-up?

23         MR. DONAHOE:  No, thank you.

24         THE COURT:  You can step down.

25         Would you call your next witness.

| | |
|---|---|
| 1 | MR. DONAHOE:  Martin White. |
| 2 | THE COURT:  Come up in front of the room, raise your |
| 3 | right hand and be sworn, please. |
| 4 | (MARTIN WHITE sworn in.) |
| 5 | THE COURT:  Have a seat right over here, please. |
| 6 | Would you state your full name for the record. |
| 7 | THE WITNESS:  Martin Lee White. |
| 8 | THE COURT:  Mr. White, what city do you live in? |
| 9 | THE WITNESS:  Missoula, Montana. |
| 10 | THE COURT:  What's your profession or occupation? |
| 11 | THE WITNESS:  Currently unemployed, looking for |
| 12 | work. |
| 13 | THE COURT:  Mr. Donahoe. |
| 14 | DIRECT EXAMINATION |
| 15 | BY MR. DONAHOE: |
| 16 | Q.    Mr. White, do you know Mr. Nielsen? |
| 17 | A.    Yes, I do. |
| 18 | Q.    How do you know him, sir? |
| 19 | A.    I used to live with his mother. |
| 20 | Q.    Directing your attention to January 5th through |
| 21 | January 9th, did you have contact with Mr. Nielsen? |
| 22 | A.    Every day. |
| 23 | Q.    And how did you have that contact? |
| 24 | A.    Usually by way of either phone calls or he would come |
| 25 | over to his mother's house and use the Internet. |

WHITE, MARTIN

1    Q.    Now, you were renting space from his mom?

2    A.    Yes, I was.

3    Q.    And did you have a computer set up?

4    A.    Yes, I did.

5    Q.    Did you have a common education interest with

6    Mr. Nielsen?

7    A.    Yes, I did.  We were attending the same online

8    university.

9    Q.    So Mr. Nielsen would visit his mom's place and do the

10   school work with you?

11   A.    Yes.

12   Q.    And that was a common and frequent occurrence?

13   A.    Yes, every day.

14   Q.    Now, during this period between 5 and 9 January, did you

15   have occasion to visit Mr. Nielsen's apartment while A.J. was

16   there?

17   A.    One day.

18   Q.    And was there a specific purpose that you went to the

19   apartment for?

20   A.    Mr. Nielsen had called me to ask if I could come over

21   and help move a bed frame.

22   Q.    And were you happy to do so?

23   A.    Yes, I was.

24   Q.    Did you have contact with A.J.?

25   A.    She introduced herself; that was about the extent of the

WHITE, MARTIN

1    contact with her.

2    Q.    Can you talk to me about the configuration of the

3    apartment.  I mean, is it a big apartment?  Is it a small

4    apartment?

5    A.    It was a fairly small one-bedroom apartment.  When you

6    walk in the door, you were right there in the kitchen.  The

7    living room was right there off of the kitchen.  Then there was

8    a slight dividing wall between the living room and the bedroom,

9    and the bathroom was off of the bedroom.

10   Q.    Had you been there on other occasions?

11   A.    Yes, I had.

12   Q.    So this was comfortable for you?

13   A.    Yes.

14   Q.    He's your friend and you are in and out.

15   A.    Yes.

16   Q.    Where was A.J. when you went in?

17   A.    She was in the living room sitting in the chair watching

18   TV.

19   Q.    And was she clothed?

20   A.    Yes, she was.

21   Q.    Did she arise and come and introduce yourself to her, or

22   did you go to her or did you meet halfway or what?

23   A.    She introduced herself while sitting in the chair.

24   Q.    And was any representation made as to any kind of

25   relationship between Mr. Nielsen and A.J.?

1   A.    Not at that time.  But a couple days prior to that

2   William had told me that him and A.J. were together.

3   Q.    And meaning what?

4   A.    That they were dating.

5   Q.    They were dating, okay.

6         Did you have any other involvement with Mr. Nielsen

7   and A.J. after that?

8   A.    No.

9   Q.    I have nothing further.  Thanks.

10        THE COURT:  Cross-examination?

11                    CROSS-EXAMINATION

12  BY MS. PETERSON:

13  Q.    So when you went over to that apartment and you saw her

14  in his apartment, you knew that they were engaged in a

15  relationship at that point?

16  A.    That's what I had been told, yes.

17  Q.    Did you know that Mr. Nielsen was a registered sex

18  offender?

19  A.    Yes, I did.

20  Q.    Did you contact the police?

21  A.    No, I did not.

22  Q.    Did you contact anybody with regard to that girl being

23  in his apartment?

24  A.    No, I did not.  As I was told, she was over the age of

25  18.

WHITE, MARTIN

1   Q.    And did you think that the 12-year-old girl looked over

2   the age of 18?

3   A.    I didn't get that good of a look at her.  As I said, I

4   was there helping William move a bed frame.

5   Q.    Were you able to see any of the bruises or bite marks

6   over her body?

7   A.    No.

8           MS. PETERSON:  No other questions, Your Honor.

9           THE COURT:  Redirect?

10                    REDIRECT EXAMINATION

11   BY MR. DONAHOE:

12   Q.    Well, I guess it's been raised, the subject of

13   condition.  What was the young lady's condition?

14   A.    To me, she appeared perfectly healthy.  She was sitting

15   in the living room watching TV.  She did not appear distressed

16   in any way.

17   Q.    Did it appear that she was being held captive?

18   A.    No.

19   Q.    Would it, in your mind, make sense for an individual to

20   invite you to an apartment where he had somebody being held

21   captive?

22   A.    No.

23   Q.    Did she appear to you to be in a drugged condition?

24   A.    No.

25   Q.    Or out of it in any way?

WHITE, MARTIN

```
1    A.    No.

2    Q.    I have nothing further.

3         THE COURT:  What did Mr. Nielsen tell you about this

4    relationship?  When did it start?  Who--

5    A.   It started right around the first of January, from what

6    he had told me.  And he told me that the lady had almost run

7    him over with her vehicle and that they had started a

8    relationship off of that basis.

9         THE COURT:  That the woman that was sitting in the

10   chair almost ran over Mr. Nielsen--

11   A.   Yes.

12        THE COURT:  --in a vehicle?  And did he tell you

13   when that occurred?

14   A.   No, he did not.

15        THE COURT:  Did he tell you about any phone contact

16   or any other contact with the person?

17   A.   No, he did not.

18        THE COURT:  Did he have any guy-to-guy talk with you

19   about what kind of sexual activity was going on?

20   A.   No, he did not.

21        THE COURT:  All right.  You can step down.

22        Call your next witness.

23        MR. DONAHOE:  Betsy Anderson, please.

24        THE COURT:  If you would, please, step up, raise

25   your right hand.
```

1        (BETSY ANDERSON sworn in.)

2            THE COURT:  Take a seat over here, if you would.

3   Would you state your full name for the record.

4            THE WITNESS:  My name is Betsy Anderson.

5            THE COURT:  And state what your position is and what

6   city you live in.

7            THE WITNESS:  I'm an investigator with the Federal

8   Defenders Office and I work out of our Helena branch.

9            THE COURT:  Mr. Donahoe.

10                   DIRECT EXAMINATION

11  BY MR. DONAHOE:

12  Q.    Betsy, you and I work together, correct?

13  A.    Correct.

14  Q.    And at my request did you conduct an investigation and

15  review extensively the discovery in this case?

16  A.    Yes.

17  Q.    Included in the Government's papers, was there a

18  toxicology report for A.J.?

19  A.    There was.

20  Q.    And we have a copy of it with us, don't we?

21  A.    We do.

22  Q.    And it's a personal document, isn't it?

23  A.    Yes.

24  Q.    Let's talk about what's not in the report.  Is there

25  anything in the report that talks about cocaine?

ANDERSON, BETSY

1    A.    No.

2    Q.    Anything untoward like Percocet, methamphetamine,

3    anything of that nature?

4    A.    No.  There was testing for a wide variety of street

5    drugs, prescription medications, date rape drugs.  I'm not sure

6    if alcohol was tested or not.

7    Q.    But basically it's a pretty clean report, correct?

8    A.    Right.  It came back negative for everything but THC.

9    Q.    The original connection between Mr. Nielsen and A.J. was

10   through a thing called Livelinks.  Can you tell me about that?

11   Was there any activity in the investigation you conducted into

12   this Livelinks business?

13   A.    I did.  When we were preparing for trial, we had our

14   computer technician in Great Falls sign up for Livelinks so

15   that we could get an idea of what kind of a site it was.  I did

16   a little bit of computer Internet research on it.  It's

17   basically an 18-and-over sex chat line.

18   Q.    And is there some kind of registration form or do you

19   sign up to get in?

20   A.    It's all over the phone.  You sign up and you leave a

21   recorded message that other people can then call in and listen

22   to.

23   Q.    And must you be 18 years of age or older to access this

24   Livelinks?

25   A.    That is their requirement, yes.

ANDERSON, BETSY

1  Q.     And apparently A.J. was accessing it, correct?

2  A.     Correct.  She had signed up.

3  Q.     In the discovery, and maybe through investigation, did

4  you determine whether A.J. had ever accessed Livelinks at times

5  other than with Mr. Nielsen?

6  A.     Yes.  Considerably.

7  Q.     And can you tell me about that?

8  A.     She signed up--she got her cell phone, was on December

9  24th, and I believe she registered--it was either December 28th

10 or January 1st.  I'm not sure which.  December 28th is when she

11 registered.

12 Q.     And did she access Livelinks while she was here in

13 Missoula --

14 A.     Yes.

15 Q.     -- from the cell phone that she was carrying with her?

16 A.     Yes.

17 Q.     Do you know how much time elapsed from the first call

18 between the two parties until departure on the bus?

19 A.     Approximately 56 hours.

20 Q.     And how was the trip funded?

21 A.     My understanding from the discovery is that she took the

22 money from her mother.

23 Q.     Do you know the number of times that A.J. may have

24 accessed the Livelinks line from here in Missoula?

25 A.     One time, when I saw the phone records.

ANDERSON, BETSY

1   Q.     And how many times on the chat lines otherwise, do you

2   know?

3   A.     She was on the chat line a total of 36 calls and

4   510 minutes.

5   Q.     One of the objections I wanted to address with His Honor

6   centered on the prior juvenile adjudication of Mr. Nielsen.

7          Can you tell me the parties involved there without

8   using specific names, just relationships?

9   A.     The Defendant and a half sister.

10  Q.     And from beginning to end, at least from the

11  investigation that you conducted, over what period of time did

12  that adjudication or that conduct transpire?

13  A.     One day.

14  Q.     And was it in terms of hours, minutes?

15  A.     According to the victim, it was about five minutes.

16  Q.     Was there any white pills located in any of the pictures

17  that were included in the discovery?

18  A.     Yes.  There was a bottle of white pills.

19  Q.     And did you follow up on that to determine what they

20  were?

21  A.     I did.

22  Q.     What were they?

23  A.     Ibuprofen.

24  Q.     And one last thing.  Did you make any determination

25  about who accessed the Greyhound service at least to set

49

ANDERSON, BETSY

1  up--find out when the bus may leave to Missoula and so on?

2   A.    There was a call on A.J.'s phone, I believe it was on

3  January 2nd, for about four minutes to the Greyhound 800

4  number.

5   Q.    I have nothing further.

6          THE COURT:  Cross-examination?

7                  CROSS-EXAMINATION

8  BY MS. PETERSON:

9   Q.    Did you also look at Mr. Nielsen's records and what

10  calls were made?

11   A.    I believe I did, because we got some in discovery, yes.

12   Q.    And isn't it true that the Greyhound bus station, both

13  the toll-free 800 number, as well as the local Greyhound bus

14  station, was called from Mr. Nielsen's phone before she

15  traveled?

16   A.    It may have.  I just recall that they checked his

17  computer and there was no indication that he had looked up

18  anything on the Internet about Greyhound.

19   Q.    I have no other questions.

20          THE COURT:  Any follow-up?

21          MR. DONAHOE:  No, thank you.

22          THE COURT:  Thank you.  You can step down.

23          Any other witnesses?

24          MR. DONAHOE:  No, Your Honor.  I'm finished.

25          THE COURT:  All right, let's take up your

1    objections.  Do them one at a time.

2         The first objection is the issue of whether or not

3    they met on Myspace or Livelinks.

4         I think that's resolved because a forensic review

5    showed that they met--they didn't communicate using Myspace,

6    but they do have a record of chatting and communicating through

7    Livelinks.  That's what the Presentence Report says.

8         Is there still an objection to that?

9         MR. DONAHOE:  No.

10        THE COURT:  All right.  The second objection is that

11   the victim claims she was out of it during her time at the

12   Defendant's apartment.  However, the toxicology testing looked

13   for a wide variety of drugs and the only drugs they found were

14   marijuana.  Is that still an issue?

15        MR. DONAHOE:  Well, I think it is in terms of

16   vulnerable victim being held captive and so on.  I mean, it's a

17   factual matter.  I think it's relevant to that.  It goes to

18   that.

19        THE COURT:  Okay.  Well, whether it is or isn't, I

20   don't think there's a dispute that the toxicology report, the

21   only thing they found was marijuana.

22        MR. DONAHOE:  Right.

23        THE COURT:  So--

24        MR. DONAHOE:  And I think a very small amount, at

25   that.  I guess it goes also to the impact statement, which I

1   can discuss later on.  We can maybe talk about that in context.

2         THE COURT:  Well, is there anything I need to rule

3   on with respect to that?

4         MR. DONAHOE:  I don't think so, Your Honor.  I think

5   that evidence is pretty clear.

6         THE COURT:  All right.  Your third objection seems

7   to be one that addresses a legal issue, that's the two-point

8   enhancement, because your suggestion is the crime did not

9   include the use of a computer, so the offense characteristic

10  doesn't apply.

11        MR. DONAHOE:  Correct.

12        THE COURT:  Okay, what's the argument?

13        MR. DONAHOE:  Well, the argument is we don't have

14  his phone.  I understand the agent's testimony.  But if Your

15  Honor would look at the language that I guess is quoted in the

16  Presentence where the two points are applied, that "if the

17  offense involved the use of a computer to persuade, induce,

18  entice, coerce."

19        So the argument is that you have to use the computer

20  as a computer and I don't know that we have proof of that here.

21        THE COURT:  Well, why is that the argument if the

22  law defines a computer as an electronic, magnetic, optical,

23  electrochemical or other high-speed data processing device

24  performing logical, arithmetic or storage problems, and

25  includes data storage facility or communications facility

1   directly related to or operating in conjunction with such

2   device?  That seems like that's exactly what the testimony is.

3          MR. DONAHOE:  And I don't dispute that.  What I'm

4   pulling into the discussion here, Your Honor, is not the

5   definition--the statutory definition, but the specific offense

6   characteristic language.

7          There's got to be some causal connection between the

8   use of that computer and the coercion, inducement, enticement,

9   et cetera.  There has to be some factual nexus between those

10  two things.  So the device, although it may be considered a

11  computer, it has to be used as such.

12         I think the testimony we have here is that they are

13  talking on the phone.  The phone is not being used in any

14  computer sense.  It's not filing any data.  It's not storing

15  any data.  It's not doing anything that a computer would do.

16         THE COURT:  The agent says it does.  Whenever you

17  make a call, it stores metadata, what the number is, who you

18  call, the length of time.  It's precisely what a computer does.

19  The only difference between a computer and the cell phones now

20  is sort of how the information--the electronic information gets

21  from whatever the device is to the other device.

22         MR. DONAHOE:  All right, I won't belabor the point.

23  I'm just trying to emphasize that the phone was not being used

24  as a computer.  I understand that it is a computer and I don't

25  dispute that.  What I'm arguing is that it wasn't used as such

1   to effect the coercion to fall within the terms of the specific

2   offense characteristic.

3           It's kind of like the gun cases where we went

4   through that period of years where guns were being traded for

5   drugs, and there was a series of cases that discussed whether

6   my giving an individual my gun in exchange for drugs was use of

7   the gun.  And the discussion centered, and the holdings

8   ultimately centered on doing that is not using a gun as a gun.

9   It's still a gun.  I'm not using it as a gun, so I can't be

10  held accountable for that.

11          And I'm trying to overlay that analysis here.  I

12  would be completely willing to concede the point if the

13  testimony was, well, we accessed the texting that went on

14  between the two and it was clear that from the discussion, you

15  can just follow it in the texting, that that's what effected

16  her departure from Wyoming.  I think there is no question

17  there.

18          But here we can't determine, based on the testimony,

19  whether the coercion was effected by the conversation or the

20  text.  There is no text.

21          Agent Shaide seems to concede that the coercion

22  apparently occurred during the conversation.  And I'm saying

23  even though the cell phone is a computer, it's not being used

24  as such at the time.  It's not storing any data, with the

25  exception of the metadata, any data that's relevant or useful

1    to determining whether the coercion occurred.

2          THE COURT:  Well, the cases don't seem to follow

3    that view, do they?  The 8th Circuit and the 7th Circuit

4    circuit.  You are distinguishing them by saying they are wrong.

5          MR. DONAHOE:  No, I'm distinguishing them on my

6    facts.  I don't want to quarrel with them.  I don't think

7    anybody raised this argument there.  And I don't think that

8    those decisions covered this particular point.  They don't.

9          Your Honor, I think we have to remember that the

10   operative crime here is the words themselves.  A crime is

11   complete once the coercion, enticement, inducement is effected.

12   That's the nature of this crime for which he stands convicted.

13   And that specific offense characteristic language tracks it

14   almost verbatim.  There has to be proof of that.

15         On top of which we have this issue lurking out there

16   that in the beginning of this connection between these two

17   individuals, he thinks that she's an adult.  So that would have

18   to be sorted out on some level, I think.

19         THE COURT:  Well, he pled guilty to this.

20         MR. DONAHOE:  Well, I understand that.

21         THE COURT:  And he testified that he knew that she

22   was 12 years old 56 hours, roughly, before she came.

23         MR. DONAHOE:  And I understand that and I want him

24   to get credit for that.  And I'm standing here, and we'll get

25   to it, I suppose, with the Government asking for a sentence of

1   480 months.

2           THE COURT:  Yes.

3           MR. DONAHOE:  I'm just trying to point out that we

4   did come in and plead guilty.  That there were a variety of

5   things that could have been discussed at a trial.  I still

6   believe that.  But Mr. Nielsen wanted to come in and do it this

7   way, and I think the Court has what information it needs.

8   That's where I stand on the computer issue.

9           THE COURT:  All right.  Well, let me hear what

10  Ms. Peterson has to say about that.

11          MS. PETERSON:  Your Honor, the coercion and the

12  enticement by use of the phone is an entire course of action

13  that took place.

14          What the Defense is trying to do is trying to say

15  that the phone was not used, which frankly is completely

16  impossible.  The phone is exactly what was used for this entire

17  offense.  It's how he committed the offense.

18          And so, yes, a cell phone is a computer.  And, yes,

19  he used that in order to communicate with the victim in this

20  particular case.  It included voice calls, but it also included

21  text messaging based on his admission alone.  I just don't see

22  any way around how this 2-point enhancement would not apply.

23          THE COURT:  All right.  I agree with the Government.

24          The Application Notes define computer as that set

25  forth in 18 U.S. Code 1030(e)(1); and that means that the term

1   computer means an electronic, magnetic, optical,

2   electrochemical or other high-speed data processing device

3   performing logical, arithmetic or storage functions and

4   includes any data storage facility or communications facility

5   directly related to or operating in conjunction with such

6   device.

7          The Guideline 2G1.3 says, "If the offense involved

8   the use of a computer or an interactive computer service to

9   persuade, induce, entice, coerce, facilitate the travel of the

10  minor to engage in prohibited sexual conduct, or entice,

11  encourage, offer or solicit a person to engage in prohibited a

12  sexual conduct with a minor, increase by two levels.

13         I think that the Application Note, as well as the

14  Guideline itself and the statute has specific facts here.

15  There is no question that Mr. Nielsen used the phone, which is

16  a computer device, and he used it to entice a 12-year-old girl,

17  that he knew was 12 years old, to come to Montana to engage in

18  sexual activities which actually occurred.

19         So that objection is overruled.

20         Your next objection.  We're at No. 4.

21         MR. DONAHOE:  No. 4.

22         THE COURT:  The vulnerable victim.

23         MR. DONAHOE:  Yeah.  All right.  I think the

24  standard here is unusual vulnerability, and the argument is

25  that there is no showing.  The Government hasn't produced any

1    evidence that shows that this individual was unusually

2    vulnerable.

3           THE COURT:  What about the testimony that came out

4    this morning that she was troubled?  She was in a situation

5    where parental divorce, looking for some solace, activity.

6    Isn't that--for a 12-year-old, I mean.

7           MR. DONAHOE:  Your Honor, I guess there are a couple

8    of things.  You know, this is a very difficult thing to discuss

9    with the Court because we are talking about somebody that is

10   12 years old.

11          THE COURT:  Right.

12          MR. DONAHOE:  I understand that and I don't mean to

13   be insensitive.  Believe me, I don't.  I'm a father, I'm a

14   grandfather, so I'm totally sympathetic to this particular

15   situation.

16          But I think there are some things that we have to

17   discuss here objectively.  The first is that I noticed on

18   FindLaw yesterday, and I have a copy of it here, a 12-year-old

19   girl was sentenced for cyberstalking for aggressively bullying

20   another individual.

21          It's not something that I cited in my papers, but I

22   bring it up now to show that various authorities, on occasions

23   that warrant them, can turn the tables on youngsters and

24   prosecute them as criminals.  And they do that without

25   compunction and probably justifiably so.

And I think that the point that I want to make here is that it's--the vulnerability that arises out of one's age is incorporated into the specific offense characteristics that was added on for her age, so we've already covered that.  This is, even at a glance, redundant trying to add in these extra points.

The second is that on the facts here we have some problems.  We did discuss openly the interviews between Mr. Nielsen and the agents, and A.J. and the agents.  And there's something very interesting in the beginning of A.J.'s statement.  And this is already in the record in one of the motions that I filed.  And I have it here, I have it marked.  That statement was before the Court, I think, in the Rule 412 process.

But in any case, at the beginning of the statement the agents, and I think reasonably so, want to make sure that A.J. has the understanding that she needs to tell the truth.  So they run through a series of questions that are pretty good, you know, to test her abilities along that line.  And one of the agents, I forget which, says, *You know, this guy here, he's my partner and he's my friend and most of the time he's a good guy but he can be a creep.*

I might have that wrong.  He was trying to be, you know, sort of light about it.

He said, *If I said that, would that be the truth or*

1   *a lie?*  And very perceptively A.J. says, *It would be neither.*

2   *It would be an opinion.*

3          And I'm just hard pressed with that ability, you

4   know, that she displays at the onset of her statement, then to

5   go on and talk about being sexually active, having used drugs.

6   She claims that she's more mature than the average 12-year-old.

7   And I hasten to add that she was one month away from her 13th

8   birthday.

9          When you look at that contextually with the fact

10  that she went to her mom's purse, took the money, went to the

11  bus depot, arranged for her transportation, for the life of me

12  I can't understand why the authorities at the bus depot or at

13  least the clerk didn't question her, or how she negotiated

14  that.  But she gets on the bus and she comes to Montana.

15         They are all things that were done of her own

16  volition and by her own admission so that she could become

17  involved in some drug usage.  She was willing to text, to sext,

18  to have phone sex.  She accessed that line on Livelinks at

19  times beyond her involvement with Mr. Nielsen.  So I don't see

20  the unusual vulnerability.

21         And if the criteria is going to be people of a young

22  age that come from disadvantaged circumstances, that's not

23  unusual, Your Honor.  It's ubiquitous.  It's everywhere.  I

24  mean, percentagewise that you are going to encounter an

25  individual like that who represents herself to be 18 in order

1    to get the ball rolling, that does not comport with unusual

2    vulnerability.

3           And any vulnerability that needed to be taken into

4    account here, and I agree that there was, is taken into account

5    under the heading of her age and the difference between--the

6    age difference between the two, which is noted in the

7    Presentence Report because it raises a presumption of

8    vulnerability.

9           THE COURT:  All right.  Ms. Peterson.

10          MS. PETERSON:  Your Honor, all of the reasons that

11   the Defense is using to try to argue why this enhancement

12   should not be applied is exactly why it should be applied.

13          And I looked for Ninth Circuit case law in this

14   particular area and the only thing that I came up with, Your

15   Honor, was the *United States vs. Evans*, which is 272 F.3d 1069.

16   It's a 2001 case.  And it was a Mann Act case where it was a

17   15-year-old girl whose father had died, whose mother was

18   incarcerated and who had worked as a prostitute prior to

19   meeting the defendant.  And the Court found that she was more

20   vulnerable than the average minor victim and that supported the

21   enhancement of the defendant's sentence for violations of the

22   Mann Act on targeting a vulnerable victim.

23          And that's exactly the Government's position in this

24   particular case.  It is not just her age.  It is something

25   above and beyond her age.  It has to be something that the

1   Defendant knows about and takes advantage of.  And what he knew

2   about almost immediately from their phone contact, and that

3   came out through the Defense's investigator, that they started

4   having contact about 56 hours before she arrived here, he says

5   that he found out she was 12 two to three days before she

6   arrived here.  That's the same time frame.

7          He knows immediately that she's 12 and then

8   immediately starts getting into her background.  This is a

9   little girl who starts talking about drugs, starts talking

10  about drug use.  Starts talking about sex, is actually willing

11  to engage in sex with him.  Wants to run away from home.  Wants

12  to get away.

13         And who is standing there with open arms but William

14  Nielsen.  And it is that specific fact, it's those items that

15  make her vulnerable.  That is what opens her up for the

16  Defendant's ability to go after her and to coerce her and

17  entice her, because he knew that she was a troubled little girl

18  that wanted to get away, that would not go and report that a

19  sex offender was talking to her on the cell phone.

20         THE COURT:  Well, what do you make of the

21  Application Notes that say do not apply subsection (B) if the

22  factor that makes the person a vulnerable victim is

23  incorporated in the offense guideline?

24         MS. PETERSON:  I don't believe that it is

25  incorporated in the offense guideline Your Honor.  Because,

1  again, I agree that the age is incorporated into the offense

2  guideline in that it is--the number itself is taken into

3  account, but in this there is something more than her

4  particular age.  And with regards to--that's also what takes it

5  out of the double counting issue, Your Honor.

6          With regards to that, one of--the guideline that

7  talks about unduly influencing a minor goes to the minor's

8  voluntariness.  It doesn't go to her vulnerability.

9          What this particular enhancement goes to is the

10  Defendant's conduct.  It focuses on his behavior, not on her

11  behavior.  And in this particular case this victim was opened

12  up and was unusually vulnerable because of everything in her

13  background, and he knew it and that's why he took advantage of

14  it.

15          THE COURT:  Well, the example they give is, "The

16  offense guideline provides an enhancement for the age of the

17  victim, this subsection should not be applied unless the victim

18  was unusually vulnerable for reasons unrelated to age."

19          Your argument seems to be that given her age she was

20  vulnerable.

21          MS. PETERSON:  It's not, Your Honor.  I think it's

22  reasons unrelated to her age.  It's her background.  It's the

23  fact that she came from a troubled home, was partying, had

24  already had sexual contact with other individuals, wanted to

25  get away, and he was standing there open and ready.  It's not

1    just that she's 12.

2            Now, that being said, I don't think that the Court

3    can absolutely just bottle the fact that she's 12 away.  I

4    don't know any way to absolutely distinguish the two and not

5    take that into consideration, because certainly a 12-year-old

6    who is seeking to run is different than what a 17-year-old

7    would be.

8            But in this particular case we have the additional

9    factors that make her unusually vulnerable.  It wasn't just

10   that she was 12.

11           THE COURT:  Right.  But if I understand

12   Mr. Donahoe's arguments--and I understand that he is trying to

13   do it in a fashion that is not accusatory of a 12-year-old

14   girl.  But if you look at the objective facts and if you go to

15   seventh grade or sixth grade and pick out a girl and say, *I

16   want you to make arrangements for getting on a Greyhound bus.*

17   *I want you to figure out how you are going to finance it.  I*

18   *want you to--*

19           I've never even heard of this whatever service it

20   was that they got connected, to know how to do that, use it.

21   In addition to her own descriptions as being not like an

22   ordinary 12-year-old person, and that the things you are

23   pointing out:  Her sexual activity, her activities as it

24   relates to controlled substances, that's not your typically

25   vulnerable 12-year-old girl.

1          MS. PETERSON:  But it is, Judge, if you think about

2    it from the standpoint that those items are what make her

3    vulnerable.  And that's why I pointed the Court to the *Evans*

4    case that talk about the fact that this girl was already

5    engaged in prostitution and came from a problem--a broken home

6    where--that she had parental issues.

7          Because, again, we wouldn't be dealing with an

8    unusually vulnerable victim if it was someone who had a really

9    strong connection, who was not willing to make the leap, I

10   guess, that she was.

11         And that's what the Defendant preyed on, was the

12   fact that she was into these things and did have this kind of a

13   background and was willing to party with him, to use their

14   words and not my words.

15         But, you know, I don't think it's unusual--if we

16   focus on the age, it's certainly not unusual for a 12-year-old

17   girl to think that they are more mature than the average person

18   or anything like that, Judge.  You know, the 12-year-old girl

19   is just done with junior high, getting ready to go into high

20   school.  And so they are not quite there yet they think they

21   are, when in reality they are completely naive and don't know

22   anything.

23         With regard to all of the victim's actions leading

24   up to her getting to Montana, I think it's really important to

25   keep in mind that the Defendant was the one who was engaged in

1 helping her along the entire way.  The records that show that

2 the Defendant was the one who was calling the bus station and

3 she didn't know how to get the money and she didn't know how to

4 get up there, but she, you know, she used his last name.  He

5 was helping her every step of the way.  This was not just some

6 little 12-year-old girl who just arrived and came to this

7 entire--this entire travel, this entire trip all by herself.

8 He helped her.  He gave her the ideas.  He gave her the phone

9 numbers.  He was standing at the bus station ready and waiting

10 for her.

11   THE COURT:  All right.  I'm going to reserve on that

12 until we get to the next one.

13   MR. DONAHOE:  Judge, I didn't know the *Evans* case,

14 but I did find a case called *Luca*, it's at 183 F.3d 1018.

15   And in Footnote 5 the Court says, "We reject the

16 argument that a person of advanced age or extreme youth is by

17 that fact alone unusually vulnerable without regard to

18 individual characteristics," and they go on and give a couple

19 of illustrations.

20   I just want to close up on that by saying that

21 almost mantra-like I listened to these interviews.  And the

22 agents were sort of just totally flummoxed, you know, when they

23 were talking to Mr. Nielsen.  And it--just time after time, *But*

24 *she was 12, but she was 12*.

25   And I understand that we have a fixation on that,

 1   and justifiably so, but that's already been taken into account

 2   and it doesn't make her unusually vulnerable.

 3              I think the last one, Your Honor, is--

 4              THE COURT:  4B1.5, never convicted.

 5              MR. DONAHOE:  Right.  That's pretty up and down for

 6   me, Judge.

 7              THE COURT:  Have you seen the judgment?

 8              MR. DONAHOE:  What judgment?

 9              THE COURT:  Against Mr. Nielsen.

10              MR. DONAHOE:  No.  They wouldn't disclose it to us.

11              THE COURT:  Do you want to see it?

12              MR. DONAHOE:  Yes.

13              THE COURT:  I've highlighted a couple portions on

14   the first and second page.

15              MR. DONAHOE:  I don't think it affects my argument,

16   though.  It really doesn't.

17              THE COURT:  I thought your argument was he hadn't

18   been convicted.

19              MR. DONAHOE:  Well, convicted in the sense as an

20   adult.  He was never convicted as an adult.  He was adjudicated

21   a delinquent.  I think under Montana law under *Hastings* and

22   under Ninth Circuit law, that is clearly not an adult

23   conviction.

24              THE COURT:  Well, "The youth then admitted to sexual

25   assault in violation of Section 45-5-502(1) and (5)(b) of

1   Montana Codes Annotated, as defined in Section 45-2-101(66)(b)

2   and 45-5-501(1)(b)(iv) MCA."

3            Then it says, "Based on the youth's admission, this

4   court found the youth to be a delinquent youth and scheduled a

5   dispositional hearing."

6            MR. DONAHOE:  Right, and I don't think it changes my

7   argument.  Maybe I'm not getting my point across here.

8            But if we just used the Guidelines here--I'm in the

9   2010 green book at Page 379 under 4A1.2d.  And there's language

10  there that says, "If the Defendant was convicted as an adult

11  and received a sentence of imprisonment," et cetera, "add three

12  points."

13           THE COURT:  What page?  You are not at the right

14  book.

15           MR. DONAHOE:  379.  I'm in the green book.

16           THE COURT:  379, that's not the same thing on mine.

17           MR. DONAHOE:  4A1.2d.  I don't think the language

18  has changed.

19           THE COURT:  Well, the Guidelines 4B--

20           MR. DONAHOE:  I understand that.  I'm just making a

21  distinction here between an adult conviction and a juvenile

22  adjudication.

23           If you compare the subparts of 4A1.2d, you'll notice

24  the Sentencing Commission recognizes a distinction between a

25  juvenile who's convicted as an adult and a juvenile who is

1  treated as a juvenile.

2          THE COURT:  Okay.  So what's your objection?

3          MR. DONAHOE:  So my objection is, if the Sentencing

4  Commission in Chapter 4 recognizes the distinction between a

5  juvenile who was treated as an adult and a juvenile who was

6  treated as a juvenile, and then later in the same chapter, at

7  4B1.5, says, "In any case in which the Defendant's instant

8  offense of conviction is a covered sex crime, career offender

9  does not apply," both those circumstances are met here, "and

10  the Defendant committed the instant offense of conviction

11  subsequent to sustaining at least one sex offense conviction."

12  Conviction.

13          THE COURT:  I'm not understanding your argument.  So

14  the Application Note is a career offender, that's 4B1.5.  4A1.2

15  has to do with criminal history.

16          MR. DONAHOE:  Right.  And criminal history tells us

17  that there's a distinction between--

18          THE COURT:  But that's for counting points on the

19  criminal history.

20          MR. DONAHOE:  I understand that.  But they use the

21  same language, Your Honor, and they are not drawing a

22  distinction.  They are not pulling in both of those subparts of

23  4A1.2d.

24          A juvenile adjudication is a juvenile adjudication.

25  In order for 4B1.5b to apply, subpart A, it should read "sex

1    offense"--"at least one sex offense conviction or

2    adjudication."  It should say that and it doesn't.

3           THE COURT:  Well, that's my point.  That's for

4    criminal history.  We're talking about dangerous sex offenders,

5    that's what 4B1.5 is.

6           And what your argument is, is that you could have a

7    serial rapist who is a juvenile that gets adjudicated nine

8    times for being a serial rapist and he wouldn't be considered a

9    dangerous sex offender.

10          MR. DONAHOE:  That's exactly the argument.

11          THE COURT:  It doesn't make sense.

12          MR. DONAHOE:  Well, Your Honor, it doesn't--we have

13   to go by what the Sentencing Commission did here.  It says sex

14   offense conviction.

15          THE COURT:  You are talking about two different

16   parts of the Guidelines.

17          MR. DONAHOE:  Well, but it says conviction.  And

18   under both Montana law--and I cited the case in the memo,

19   *Hastings*.  Under Montana law that adjudication is an

20   adjudication.  He was adjudicated a delinquent.  He wasn't

21   convicted of an offense.

22          THE COURT:  Is he a registered sex offender?

23          MR. DONAHOE:  Yes, he would have to be under SORNA.

24          THE COURT:  Yeah.  And so that's based on what, an

25   adjudication?

1          MR. DONAHOE:  An adjudication, because there is

2   specific language in the statute that converts the adjudication

3   to a conviction.  There is no such language in these

4   Guidelines.  The distinction is continuously recognized.

5          THE COURT:  Where is the language in 4B1.5 that

6   supports the argument you are making?

7          MR. DONAHOE:  It's the absence of language.  It says

8   conviction.  It doesn't say adjudication.  He has to have a sex

9   offense conviction.

10         THE COURT:  What specific point are you making out

11  of 4B1.5?  Give me a citation to the exact place you are

12  looking.

13         MR. DONAHOE:  I'm looking at 4B1.5, subpart A.  And

14  the last phrasing that begins with "and."

15         "And the Defendant committed the instant offense of

16  conviction subsequent to sustaining at least one sex offense

17  conviction."  That's a term of art.  Conviction doesn't mean

18  juvenile adjudication.

19         THE COURT:  Well, is the word "conviction" defined

20  in part B?

21         MR. DONAHOE:  Well, it's not.  But if you look down

22  at sub B, which I say does apply, the pattern, it's pulled in

23  there.

24         THE COURT:  18 U.S. Code.

25         MR. DONAHOE:  It's not that it's not countable or it

1    can't be used.

2            THE COURT:  Well, what about the definition in 2426

3    in Title 18 and the Application Note, "Sex offense conviction

4    means an offense described in 18 U.S. Code 2426(b)(1)(A) or

5    (B)"?

6            And (b)(1)(B) says, "Under state law for an offense

7    consisting of conduct," that would have been under a chapter

8    referred to in Paragraph 1, "If the conduct had occurred within

9    the special maritime territorial jurisdiction of the United

10   States."

11           MR. DONAHOE:  All right.  And it wouldn't be.  It

12   wouldn't have been.  It wouldn't have been under federal law.

13   I mean, even under federal law what Your Honor has before you

14   there in the judgment would still be a juvenile adjudication

15   under 5032.

16           So even a retrospective look, it still would have

17   been a federal juvenile adjudication.  There was no way that he

18   could have been moved into adult court under 5032.

19           THE COURT:  There is no way?

20           MR. DONAHOE:  No.  For that offense?

21           THE COURT:  For that offense.

22           MR. DONAHOE:  For that offense.  If we assumed all

23   of the federal circumstances existed, jurisdictional

24   circumstances existed, under the federal Juvenile Delinquency

25   Act he could never have been waived into adult court.

1          And subpart A of 4B1.5 requires a sex offense

2     conviction, not an adjudication.

3          THE COURT:  Well, your argument doesn't make sense

4     to me in light of the analogy that I postured for you, and that

5     is he could have been convicted of serial rape nine times.  He

6     could have been adjudicated nine times and that wouldn't--

7          MR. DONAHOE:  As a juvenile and then he would fall

8     within (B).  It would be a pattern of sexual activity.

9          THE COURT:  All right.  Well, let's hear what the

10    Government has to say.

11         MS. PETERSON:  Your Honor, we believe that the PSR

12    has correctly applied it and that it does apply.

13         It's interesting because Mr. Donahoe's directing the

14    Court to 4.1--4B1.2 was actually something I was going to do,

15    Your Honor.  And that is to say that when the Commission means

16    adult conviction, they say adult conviction, and that's exactly

17    what they did in 4B1.2 when they are defining a career

18    offender.

19         But as the Court correctly points out, we're not

20    talking about the definitions for a career offender.  We're

21    talking about the definitions that apply to repeat and

22    dangerous sex offenders against minors.

23         And if the Court goes to the definition in that

24    section that applies to that Guideline and not the one that

25    applies to the career offender guideline, it says sex offender

1   convictions means any offense.  Certainly that offense applies.

2          THE COURT:  What Guideline are you talking about

3   now?

4          MS. PETERSON:  4B1.5.

5          THE COURT:  Yes.

6          MS. PETERSON:  It's everything that the Court has

7   already pointed out, Your Honor.  It's the Application Note 3

8   that specifically defines what they mean by sex offender

9   conviction.  And it specifically says--you know, the Defense is

10  arguing this is a term of art.  He's correct, it is a term of

11  art.  And it's a term of art that the Commission has defined

12  and they have defined it by meaning any offense.  They don't

13  say any adult conviction like they do under the career

14  offender.  It clearly meets the definition it sets forth in

15  Application Note 3 and, therefore, we believe that it applies.

16          Trying to use the definition that is set forth in

17  juvenile male or a Montana Supreme Court case to say that it's

18  an adjudication instead of conviction is like comparing apples

19  to oranges.  It's appropriate to use the definition that is

20  within the particular guideline that we're talking about.  And

21  within that guideline, that prior sex offense should count.

22          THE COURT:  Well, we're going to take a ten-minute

23  break here, but I think that the Government has the better

24  argument as it relates to the last objection.  And I don't

25  think that Mr. Donahoe's argument stands up for the reasons

1    that the Government has just articulated and for those

2    reflected in my questions.

3            I understand his argument, but it doesn't make

4    sense.  Here the Defendant was adjudicated of being guilty of,

5    based on his admission, sexual assault as defined under Montana

6    law.

7            For purposes of calculating his criminal history, I

8    think Mr. Donahoe is correct.  It would be inappropriate to

9    count that in a fashion as one would with an adult.

10           But when it comes to the application of 4B1.5,

11   Repeat and Dangerous Sex Offender Against Minors, the

12   individual that was involved in the State matter was a

13   12-year-old.  The individual here is a 12-year-old.  I do not

14   think you could go to the Sentencing Guideline Commission and

15   say, *We have this gentleman who sexually abused a 12-year-old*

16   *when he was not an adult.  And now he's abused another--*

17   *sexually abused another 12-year-old as an adult, but we don't*

18   *think that's a repeat or dangerous sex offender.*  And I don't

19   think the argument holds water.

20           We'll take a ten-minute recess and then we'll be

21   back.

22       (In recess at 12:11 p.m., reconvened at 12:25 p.m.)

23           THE COURT:  Please be seated.

24           Well, the unresolved issue right now is the

25   application of 3A1.1(b)(1), and that enhancement applies to

1   individuals who are unusually vulnerable.

2          I've listened to the evidence here and read the

3   Presentence Investigation Report and listened to the arguments

4   made by both Mr. Donahoe and by the United States.  And I

5   confess that it is a very difficult question when you focus in

6   on details, because I think the details here can demonstrate

7   that she is unusually vulnerable.  I also think there's a

8   reasonable argument that she is unusually precocious.

9          If you consider the arguments and the factual

10  matters that Mr. Donahoe has articulated, I think it would not

11  be error to say that this young woman was not a

12  vulnerable--unusually vulnerable victim.

13         On the other hand, in weighing all of the proof I

14  think it is more likely that she is an unusually vulnerable

15  person or victim.  It would be much easier if it was a physical

16  issue, that she was in a wheelchair or incapacitated

17  physically.  It would be much easier if she were incapacitated

18  or had diminished capacity intellectually.  But here the

19  arguments and the facts that are made and the predicate of the

20  Government's argument is the social aspect of this young

21  person.

22         But when they are considered in the context of the

23  conduct of Mr. Nielsen, I think they do lend themselves to the

24  conclusion that she was an unusually vulnerable victim.  She's

25  from a broken home.  She was on an Internet--or not an

Internet--some sort of Livelinks or Livelinks sex thing where she had to be 18 to get on there.  In a short time Mr. Nielsen found out she was 12.  He found out she was from a broken home. He found out that she's destitute or that she is bored.  He knows that she's been sexually active.  He knows that she's 12 years old.  He knows that she is interested in marijuana. He has marijuana.  He arranges and helps arrange the bus trip for her.  She uses his name and his guidance in terms of the activities that she engaged in in arranging the transportation, and not to mention the fact that she was 12 years old or, as Mr. Donahoe points out, 12 years and 11 months.

I believe that the facts here, and not just her age, demonstrate that she is an unusually vulnerable person.

I can say, and I don't know how this stacks up against "unusually," but I do know that in 15 years of doing this, whether it's drug offenses, whether it's sex offenses, whether it's gun offenses, whatever the nature of the offenses are, it is not unheard of that the Defendant, who is standing there as an adult, comes from a very troubled background and broken homes, and that it--that vulnerability of children in the age between 8 and 15, I think they are unusually vulnerable to undue influence either by peers, adults or illicit activities.

I don't know what the psychological explanation is, but I do believe in this case that A.J. was an unusually

1  vulnerable 12-year-old girl.  So the objection is overruled.

2          And I don't think there are any other objections to

3  rule on, are there, Mr. Donahoe?

4          MR. DONAHOE:  No, Your Honor.

5          THE COURT:  If there are no more witnesses, then

6  I'll recognize you to allocute on behalf of Mr. Nielsen.  I

7  think you are aware that did I give notice under--I don't think

8  it's required for variation, but I did give notice under 32(h),

9  which has to do with departures from Sentencing Guidelines.

10          But in order to give Mr. Nielsen the benefit of

11  anticipating what might occur, and for you to have put together

12  whatever arguments you think would be appropriate, I have given

13  notice that I am contemplating an upward variation from the

14  Guidelines, which I should probably state.

15          The statute says the minimum here is ten years of

16  imprisonment, the maximum statutory imprisonment is 11--or

17  excuse me--is life imprisonment.  The Guidelines, as

18  calculated, are 235 to 293 months.  Mr. Nielsen is not eligible

19  for probation by statute or the Guidelines.  Supervised release

20  is no less than five years and up to life.  The Guidelines

21  recommend the same range.  He could be fined up to $250,000.

22  The Guideline range is $17,500 to 175,000.  Restitution here,

23  which we've not discussed but there is no objection to it, is

24  $7,305; that's by statute and Guideline.  The special

25  assessment is $100.

1          It will cost the American taxpayers between $554,000

2     and $690,000 to incarcerate Mr. Nielsen if he's incarcerated

3     within the Advisory Guideline range and another at least

4     $19,600 for supervised release.

5          I'm sorry I didn't say that earlier, but you may

6     proceed now.  If you would like, Mr. Nielsen can join you.

7     I'll give him an opportunity to speak after you, Mr. Donahoe.

8          MR. DONAHOE:  Thank you, Your Honor.

9          Your Honor, considering the Guideline range, we

10    would ask for a sentence of 240 months.  It's 20 years in

11    prison.  It's more than adequate, I think, in a punitive sense.

12    It serves protection of the public.  It gives Mr. Nielsen an

13    opportunity to reorient his behavior by accessing prison

14    programs.  He'll be 45 years old or thereabouts when he's

15    released.  Probably a little less counting for the good time.

16          This is a unique way to approach this, but I think

17    it needs to be said.  The Government, I think, in its totality

18    has been pretty aggressive about prosecutions in the sex

19    offender area.  In particular, the federal government has

20    become a real presence in that area, something that 20 years

21    ago was pretty routinely left to the states, except for Indian

22    reservations.

23          And I think what we have to account for that is the

24    nature of the technology now and how people can communicate,

25    and that's precisely why Congress passes laws like these so

1    that individuals can be detected and apprehended and punished.

2           And I think the hope is, inferentially from all of

3    that, we can conclude that a certain segment of the population

4    will be identified and incarcerated and, therefore, over the

5    long-term society will be protected.

6           But I also think that it should be noted that as

7    part of its weaponry, or as part of one of the many tools that

8    the Government has at its disposal now to deal with issues such

9    as these is the civil commitment aspect.  And what's

10   interesting about that is that it arose, I'm going to say,

11   within the last decade and it came basically from the state

12   systems were starting to do it.  Where people would reach the

13   end of their prison terms and then the state or that particular

14   sovereign would move and say this individual still represents

15   some kind of danger that we think is sufficient to warrant his

16   continued incarceration.

17          Now, of course, in those circumstances they move

18   them over maybe to a different kind of facility, he or she gets

19   care and so on.

20          But the United States is on board with that

21   paradigm.  And we now have individuals that are identified

22   while they are doing their incarceration, and at the end of

23   terms the United States is at liberty to make an allegation

24   that a particular individual is in need of further treatment or

25   poses some kind of danger to society and should be dealt with

1    in that fashion.  And I think that that's relevant here.

2              As a lawyer handling cases like these it's difficult

3    because it draws attention, which defense attorneys don't like.

4    At least good ones, I know.  And it, I think deservedly, raises

5    the attention of the public and people are interested in them.

6    And they almost always, always greatly concern the Court.  So,

7    you know, they present a set of challenges that are just a

8    little bit different.

9              But having said all of that, generally the

10   overriding sentiment is always, in a case like this, this

11   individual needs to be punished.  And I think that really is

12   the overriding consideration here.

13             And really where I'm going with this, Your Honor, is

14   just that we need to put some kind of distinction or draw some

15   kind of distinction between protecting the public now and the

16   punishment component under 3553(a), and recognizing that a

17   20-year sentence is sufficient but not greater than necessary

18   to fulfill all of those factors.  And that later in time if it

19   does prove to be necessary, there is certainly opportunity for

20   the United States to make its allegation in a civil commitment

21   setting if that's necessary.

22             In some ways--and you are just going to have to

23   forgive me, please, for saying this--it maybe looks worse than

24   it actually is.  When you consider in totality his background,

25   the fact that he comes to this with that prior juvenile

1    adjudication, that's kind of a game changer, I think, for him

2    as an individual defendant.

3           The rest is really what's going on in the country.

4    We have all kinds of kids using drugs, dropping out of school.

5    You know, across-the-board, and I won't get into that in depth,

6    but we have real problems there.  Our educational institutions

7    and families are failing us.  A third of high school

8    individuals drop out.  We can't be competitive.  We're really

9    kind of behind the eight ball there.  But, you know,

10   advertising.

11          Your Honor used the word, which I thought was really

12   kind of profound here, precocious.  We want our kids to grow up

13   faster, you know.  It's the rare family now that, you know,

14   kind of keeps them sheltered and protected.  And it's hard to

15   do.  Even those that try, it's hard to do.  They kind of hit

16   the street earlier now.

17          So having said all that, I can tell you Mr. Nielsen

18   is really, really sorry and I think he's going to convey that

19   to the Court.  There was some discussion about how he tried to

20   minimize.  And he did, I'll grant that.  But in the end I think

21   everyone did get a clear picture from his admissions.  He saw

22   no sense--and really brought the subject up on his own, but he

23   saw no sense in having a trial.

24          And he was with me while I was giving him advice.

25   He understood and he didn't quarrel.  And he never turned on

1   me.  You know, sometimes you get that:  *Well, gees, it's your*

2   *fault.  If I had a better lawyer.  If I had this.  If I had*

3   *that.*  He's been nothing but grateful for the work that Betsy

4   and I have done for him.  I think every call or visit that I've

5   ever had with this man, he's expressed some kind of gratitude

6   for helping him.  And I think that speaks to some element of

7   his character that shows that he's not beyond redemption, on

8   top of which he's a pretty smart guy.  And I think after

9   sitting for 20 years in prison and being pretty close to

10  50 years old, I think we'll see a different individual here.

11  Thank you.

12          THE COURT:  Thank you.

13          William Richard Nielsen, you have a right to speak

14  on your own before I impose sentence.  Do you want to exercise

15  that right?

16          DEFENDANT:  Yes, sir.

17          THE COURT:  You may proceed.

18          DEFENDANT:  I honestly regret what I have done.  I

19  can't expound on how sorry I am.  And maybe I should have

20  sought better help before it happened, but I didn't and for

21  that it's something I've got to live with.

22          All I can say is that I am sorry to A.J. for what

23  I've done and for how it's affected her.  And it's something

24  I'm going to have to live with for the rest of my life, as well

25  as her.  I can learn from my mistakes and hopefully I'll be

1    given a chance to.  That's all I have to say, Your Honor.

2              THE COURT:  Thank you, Mr. Nielsen.  You may be

3    seated.

4              Ms. Peterson.

5              MS. PETERSON:  Thank you, Your Honor.

6              I want to first start out by talking about the

7    Defense's statement that it really looks worse than it is.  I

8    could not disagree with that more.  It is every bit as bad as

9    it looks.  And that came through in both Agent Shaide's

10   testimony, as well as the Defendant's testimony when he talked

11   about the violence that he inflicted on this little girl over

12   the course of four to five days after getting her up here from

13   Wyoming.  It's absolutely horrendous.

14             If the Court were to listen to the Defendant in that

15   interview, it's somewhat similar to today in his testimony.  It

16   is completely cold and devoid of all emotion whatsoever.  When

17   you listen to that tape recording, it is just chilling.  When

18   he sits there and talks about how he did not tie her up because

19   he didn't have enough rope and gets into how he's a light

20   sadist and a bit of a masochist and he knows that for a decent

21   restraint you need six to eight feet.  He talks about these

22   things like the normal person would read off their grocery

23   list, Your Honor.  He talks about slapping her and biting her

24   and choking her because, as he says today, because she wanted

25   it.  Because this 12-year-old victim wanted it.

1        What goes on in his mind is absolutely astounding.

2   And he talks about how he's really sorry.  And I'm sorry, Your

3   Honor, but as you read through the PSR and you read through the

4   sex offender evaluation and the polygraph, I don't buy it.  I

5   don't think he is at all.  I think that he has minimized, not

6   just at the very beginning when he was caught.  But as you read

7   through the sex offender evaluation and the polygraph, he

8   minimizes all the way through that right up to the question

9   where they said, *Do you remember the victim telling you that*

10  *she was 12?  No.*  He lies after he's already admitted.  He

11  consistently minimizes all the way through in order to not be

12  held responsible for his actions.

13        If you look at the evaluation that Dr. Scolatti did,

14  that is also consistent throughout that.  It talks about, on

15  the PPIR score, that the subscore indicates that the Defendant

16  perceives himself as the innocent victim and rarely takes

17  responsibility for his actions.

18        And that's what's portrayed throughout his interview

19  and that's what's portrayed throughout his testimony here, is

20  that somehow in his mind this is what the victim wanted and he

21  was just going along with her and now he's going to have to

22  live with it as well as she is.

23        Well, he is right.  He has impacted this little girl

24  for the rest of her life.  He impacted her mind, her body, and

25  her soul, and it's something that she's going to have to live

with.

The Government's asking for 480 months, Your Honor. And I realize, as we've set out in the Sentencing Memorandum, that that is a variance above the Guideline range.  But based on the Defendant's characteristics and his history, and especially the characteristics and the conduct in this particular case, it's absolutely warranted and justified.

It's not just about punishment.  It also is about protection.  This is an individual who started treatment four different times and didn't complete it; that's in the PSR.

This is an individual that Dr. Scolatti says, "Treatment will be fairly challenging, with a difficult treatment process and the probability of reversals.  He's not likely to learn from his experience."

It's also an individual that, based on the violent recidivism scales, he falls into the highest third for offenders on violent crimes.

With regards to risk designation on the sexual recidivism rate, it's moderate to high.  He has poor impulse control.  He acts recklessly and he's irresponsible.

Everything in the evaluation points to the absolute need to incapacitate this Defendant for a very long, long period of time.  And they point consistently to the victim in this particular case.

And the only thing that I would like to say on that,

1   Your Honor, is that the victim's naivete comes through when you

2   think about the fact that she was willing to travel to the

3   State of Montana to a registered sex offender for love.

4           Your Honor, I know that the Court has thoroughly

5   reviewed everything in this case and I know that the victim's

6   parents are going to speak and, frankly, they can probably say

7   everything much more eloquently than I am saying.

8           But the bottom line is, in this particular case,

9   that this is a despicable crime that was committed by a

10  depraved individual and we believe that 480 months, followed by

11  lifetime supervised release, is absolutely required.

12          The other thing, Your Honor, that I would simply

13  point out so that it's not missed, is that pursuant to the plea

14  agreement the Defendant agreed to commit to testing for

15  sexually transmitted diseases and release the results.  And we

16  would specifically request that the Court include that as a

17  directive to the Bureau of Prisons under the Judgment so that

18  we can be sure that that is addressed.  Thank you, Your Honor.

19          THE COURT:  All right.  Under the Crimes Victims'

20  Rights Act under subpart E, which is the definition, it is,

21  "For purposes of this chapter the term 'crime victim' means a

22  person directly and proximately harmed as a result of the

23  commission of a federal offense or an offense in the District

24  of Columbia.  In the case of a crime victim who is under

25  18 years of age, incompetent, incapacitated or diseased, the

1  legal guardians of the crime victim or representatives of the

2  crime victim's estate, family members or other persons

3  appointed as suitable by the Court may assume the crime

4  victim's rights under this chapter."

5         It's my understanding that there are two--the two

6  parents of the minor that was involved would like to address

7  the Court.  Is that true?  Is it Jeff?

8         MR. JARAMILLO:  Yes, Your Honor.

9         THE COURT:  If you'd come up to the podium and state

10  your full name, if you would.

11         MR. JARAMILLO:  William Jeffrey Jaramillo.

12         THE COURT:  Jaramillo?  How do you spell that.

13         MR. JARAMILLO:  J-A-R-A-M-I-L-L-O.

14         THE COURT:  Mr. Jaramillo, under the law you have a

15  right to speak before I impose sentence.  You may proceed.

16         MR. JARAMILLO:  I don't know if you really

17  understand how many people you have infected with your

18  sickness:  My family, her mother's family.  You've taken my

19  little girl from me.  She'll never be the same.  None of us

20  will ever be the same.

21         This is a disease.  A sickness, a disease, man.  In

22  nature's way, in pride's way, those animals, they get rid of

23  diseased animals so they do not contagiously (sic) the rest of

24  the pack.  They have seen this already with your own blood.

25  This is a disease that does not have a cure.

1          You destroyed my daughter.  She had issues before.

2    She has major issues now.  I can't even hold my daughter no

3    more.  I just want to understand.

4          There is no cure for your disease.  There is no

5    cure.  The sad part is you are a young man and our society is

6    going to give you the opportunity to do this again.  My only

7    regret is I can't be 20 years younger, man.

8          Your Honor, whatever punishment this man has will

9    never be enough.  I don't believe one bit that this man can be

10   rehabilitated or anything else.  Just gives him time to sit and

11   think.  Whatever punishment this society can give to him, we

12   will have to just be with that.  There is no cure for this

13   disease these people have.

14          THE COURT:  Thank you.

15          Ma'am, would you state your full name, please.

16          MS. MARSHALL:  My name is Bobbi Jo Marshall.

17          THE COURT:  You may proceed.

18          MS. MARSHALL:  This crime has affected me and my

19   family in many, many ways.  I've sat here today and I've

20   listened to a lot of facts and a lot of evidence, but there

21   were a few things that I endured and that I seen that was not

22   mentioned that I think need to be heard.

23          We had to pose as another 12-year-old child to

24   locate and find my daughter.  He thought that another

25   12-year-old girl was running away and he took advantage of

1    that, and this is the only reason why I have my daughter today.

2           My daughter is very suicidal and she'll never be the

3    same.  This crime has not only affected her, but it's affected

4    everyone that loves her.  And I just beg that the Court never

5    gives him a chance to hurt another child or their family like

6    that again, and I want you to know that.

7           THE COURT:  Thank you.

8           The way the process works is that I have calculated

9    the Guidelines and determined what they are over the objection

10   of Mr. Donahoe on behalf of Mr. Nielsen, and the Advisory

11   Guideline range is 235 to 293 months.  I have given notice to

12   Mr. Donahoe, as well as to Mr. Nielsen, and I did that on the

13   7th day of June, that I was considering an upward variation

14   from the Advisory Guideline range.  The Guideline range is

15   simply a statistical compilation of information and without

16   consideration of the details of William Richard Nielsen.  It is

17   an abstract from statistics throughout the United States.

18           And in the abstract, the Guidelines, which are

19   advisory, are 235 to 293 months.  I believe that is inadequate.

20   And I do so having considered a multiplicity of matters,

21   including the detailed psychosexual evaluation of Michael

22   Scolatti, the briefing that's been filed in this case, the

23   Presentence Investigation Report, as well as the testimony that

24   was presented here today, the arguments of Mr. Donahoe which I

25   think are always cogent and respectful, as well as the

1    arguments made by the United States.

2           So at this point the question becomes whether or not

3    a sentence within the Advisory Guideline range, which is not a

4    presumptive sentence, but the question to be asked is what is a

5    sufficient but not greater than necessary sentence to

6    accomplish the goals that the Congress of the United States has

7    set for purposes of imposing sentence on any individual.

8           The nature and circumstances of the offense and the

9    history and characteristics of William Richard Nielsen

10   basically go hand in glove.  Mr. Nielsen is a pervert.  He's

11   been so since he was a young man.  And in this case he enticed

12   a 12-year-old girl that he met on Lavalife, knowing she was

13   12 years old, engaging in phone sex with her, and then not only

14   encouraging her and enticing her to come to Montana, but

15   revealing that he is a registered sex offender and knowing that

16   she was 12 years old.

17          He was somebody who had the medical marijuana and

18   enticed her not only with drugs but also with sex.  And it's

19   hard to believe that an adult, 25 years old, knowing that he

20   was talking to a 12-year-old, would proceed simply by saying,

21   "It can be our secret."

22          When she got to Missoula, he was there at the bus

23   station, took her to his apartment and then he denies that he

24   kept her there.  The testimony presented is that there were

25   periods during the days that she was at the apartment that he

1   was not present.  And one wonders why she didn't use the phone

2   that she had or leave the premises, but that I think goes to

3   the entire issue of what was going on with sex and drugs.

4              Mr. Nielsen was engaged in what he rationalizes as

5   soft masochism and abused her physically, slapping her,

6   slapping her on the breast, on her bottom, on her genitals.  He

7   was--but for, I guess, not having the right length of rope, he

8   would have tied her up, and who knows what he did.

9              By his own testimony when he was in his apartment

10  with her, she was unclothed and naked.  The record reflects

11  that there was repeated sexual encounters to the point that she

12  would bleed.  The police found evidence of her bruising on her

13  back, on her wrists as if she had been tied or handcuffed.

14  It's apparent from the information provided that there were

15  sexual devices that may have been involved.  And all of this

16  took place while Mr. Nielsen was so much--15 years older than

17  she was.  She was 12 years old.

18             He's never been married, although there's a question

19  of what relationships he's had with women.  He's not fathered

20  any children.  He was raised in Washington and then moved to

21  Montana at the age of 13.  When he was 15 years old, he

22  assaulted sexually his 12-year-old half sister and, as a

23  consequence, ended up in the Montana Department of Corrections

24  until he was 18 years old.  When he was released, he was on

25  status and was a registered sex offender.  He was required to

1   participate in sex offender treatment.  And I think the record

2   reflects that on four separate occasions he made a half-sincere

3   effort and dropped out of all of that sex offender program.

4          He has undergone a psychosexual evaluation and a

5   polygraph.  The polygraph administered by Donald Bell reflects

6   that Mr. Nielsen was not telling the truth in response to three

7   simple questions.

8          Dr. Scolatti's report is lengthy and sets forth a

9   number of observations and conclusions that indicate that, in

10  this case, William Richard Nielsen is a high risk to reoffend.

11  That he is unlikely to be subject to rehabilitation or to

12  treatment given his attitude and past failures and the

13  incidents that he's had with violent sex, as well as his prior

14  convictions.

15         And I do note as an aside that one of the things

16  that came up--I've not listened to the tapes of the interviews,

17  but Ms. Peterson characterized them as cold, and I think that's

18  reflected in the Presentence Investigation Report.

19         My own observation of him today when he was

20  testifying, is that it was sort of a routine thing, no big

21  deal.  In response to Mr. Donahoe's questions, a number of

22  times he did nothing more than shake his head and had what I

23  perceive as a flat affect in response not only to Mr. Donahoe's

24  inquiries but also to those of Ms. Peterson.  And, frankly, I

25  didn't find him very believable.

1            The psychosexual evaluation, on a number of pages,

2    reflect that Mr. Nielsen gave inconsistent and invalid

3    responses to some of--his inconsistent responses made some of

4    the testing invalid.  While he proclaimed to have an interest

5    in treatment, Dr. Scolatti made the observation that treatment

6    would be fairly challenging, with a difficult treatment

7    process, and the probability of reversals.  There are other

8    matters in the Presentence Report--or excuse me in Dr.

9    Scolatti's report, some of which is in the Presentence Report.

10   Mr. Nielsen lacks self control.  He lacks remorse.  He's

11   impulsive.  He's reckless.  He likes to be on the edge.  And he

12   is a person that is not likely to learn from experience, which

13   basically goes to the point I think Mr. Jaramillo made in his

14   allocution on behalf of the victim, his daughter.  That it's

15   highly unlikely in my view, given Dr. Scolatti's report and my

16   observations here, the testimony that's presented, that

17   Mr. Nielsen is likely to learn from this experience.

18           He has psychopathic traits that are in the high

19   range.  He's on the borderline of being a psychopath.  He has

20   poor judgment and apparently has no real consideration of the

21   long-term consequences of his actions.

22           There is a matter that is reflected I think in Dr.

23   Scolatti's report and elsewhere--and I'm not talking about

24   Mr. Donahoe.  I'm talking about Mr. Nielsen.  Implicit in all

25   of the things I've read, you get the sense that Mr. Nielsen

1    perceives that he's the one that's the victim and that he

2    really doesn't accept the responsibility for his actions,

3    although he said here that he's sorry.

4            He has some anger issues, and he has a persistent

5    and consistent sexual interest in prepubescent children.  He is

6    in what Dr. Scolatti calls the problematic range.  And the

7    other testing, although Dr. Scolatti's report indicates he does

8    not have an interest in hurting children, that is inconsistent

9    with the reality of what occurred here and the masochistic

10   behavior he demonstrated toward the 12-year-old victim in this

11   case.

12           Statistically, according to Dr. Scolatti, 80 percent

13   of the individuals who fall in the categories he falls in

14   reoffend violently within an average of ten years.

15           According to further testing, he's got a high level

16   of risk.  He has an antisocial personality disorder and he has

17   two sexual classifications that are sadism, which is real, not

18   simulated.  It's not something that goes on in his mind.  It is

19   real.  And then the pedophilia, which is the attraction to the

20   children.  He's a poor candidate for rehabilitative treatment.

21           And when all of those things are considered, the

22   nature and circumstances of the offense and the history and

23   characteristics of the Defendant suggest that a very, very

24   significant upward variation from the Guidelines is appropriate

25   and reasonable in this case.

1           There is a need for the sentence imposed to reflect

2    the seriousness of the offense, to promote a respect for the

3    law and to provide just punishment for the offense.

4    Mr. Donahoe argues that the whole purpose of this is, in

5    essence, the need to punish.  When we get in the '90s, this

6    kind of--the argument is these sex offenses that are being

7    prosecuted now weren't being prosecuted.  And I think that's

8    true as it relates to the Internet use of child pornography.

9    But punishment isn't the only factor with Mr. Nielsen.  I think

10   there is a significant need to protect the public.

11          The seriousness of the offense.  It's a sad comment

12   on what we are as a society, that adult males can have the

13   lascivious attraction that they do to children.  It's somehow

14   rationalized, when they are looking at sexually provocative and

15   explicit conduct of children on the Internet, that they are

16   just voyeurs, that they are just looking at it.

17          Mr. Nielsen has taken that situation to a completely

18   different level.  Not only did he attract and entice this young

19   woman to come to Montana to engage in sex and drugs, but he did

20   so when she got here, having sexual intercourse with her five

21   and six times daily for the period that she was in his

22   apartment.  His past experience, his convictions, his failure

23   to register, his difficulties with supervision all reflect that

24   William Richard Nielsen has very little respect for the law.

25          And I am sure that there are punishments that, if

1  this was in the 19th century, Mr. Nielsen would be looking at

2  much more severe consequences than what I am authorized to

3  impose here.  But I do know that if I just consider the

4  seriousness of the offense and just punishment, again I'm

5  unconvinced that 20 years is sufficient.  It's certainly not

6  greater than necessary and, in my view, a much higher sentence

7  is appropriate.

8         There is a need to afford adequate deterrence to

9  criminal conduct.  I think Mr. Donahoe makes a legitimate

10 argument that the Government does have the power to seek civil

11 commitment of Mr. Nielsen whenever he is finished with his

12 term, and that may be an option that the Government seeks to

13 pursue.  But I don't believe it's an argument that would deal

14 with the notion of specific deterrence.

15        Mr. Nielsen, based on all the information that's

16 before the Court, I think the way he is deterred is to

17 incapacitate him, and that means to lock him up in a facility

18 for an extremely long period of time just so that he does not

19 have the opportunity to engage in this kind of behavior in the

20 future.

21        As Dr. Scolatti said, he's got an antisocial

22 personality and he has borderline schizoid features.  He's a

23 sadist, a masochist.  He's callous.  He's unconcerned about the

24 feelings of others.  And he is not only impulsive, reckless and

25 irresponsible, he's irritable.  And given all of those

1  characteristics, the deterrent I think that would keep him from

2  engaging in abusing children is to be locked up where he can't

3  get at children.

4          Specific deterrence I think is an extremely

5  important factor.  I am uncertain what general deterrent a long

6  sentence may have, but it certainly may cause males in his age

7  group to think twice if they see the period of time he is going

8  to be locked up.

9          There is a need to protect the public from further

10  crimes by the Defendant for all of the reasons I've stated.  I

11  think that the public is at great risk if he is not

12  incarcerated.  He may be of an age by the time he gets out that

13  he may be incapacitated or uninterested, but a period of

14  lifetime supervised release for a repeat sex offender who has

15  no, in my view, legitimate or honest remorse about what he's

16  done, I believe that the public needs to be protected from him,

17  children need to be protected from him.  And the most

18  significant way to deal with that, with a person who is not

19  likely to be subject to rehabilitation or treatment, is to

20  incarcerate him for a long period of time.

21          There is a need to provide him with educational,

22  vocational, medical or other correctional treatment in the most

23  effective manner.  He has a drug problem.  Perhaps he can

24  benefit from the RDAP program, but this factor is not of

25  significant consequence.  Given the reports of the psychosexual

1    evaluation, it's unlikely he's going to be subject to any kind

2    of correctional treatment in any effective manner, certainly

3    not community treatment.

4            Vocational training I don't think is an issue, nor

5    is educational treatment.  He does have some medical matters

6    that he's being treated for, but they are not significant

7    enough that it would require some special part of a sentence.

8            I have stated the kinds of sentences that are

9    available.  The minimum is ten years.  He could be sentenced up

10   to life.  Supervised release can be no less than five years and

11   can be all the way up to life.  There is a need to avoid

12   unwarranted sentence disparities among defendants with similar

13   records, found guilty of similar conduct.  Mr. Nielsen stands

14   starkly alone in this District for the kind of behavior that he

15   has engaged in, so I don't think that's an issue.

16           Restitution.  He's not likely to be able to pay it,

17   but I'm going to impose it because the law requires it.

18           Mr. Donahoe, if you and Mr. Nielsen would approach.

19           William Richard Nielsen, pursuant to the authority

20   vested in me by the Constitution of the United States and the

21   laws enacted by the United States Congress, as those have been

22   interpreted by the United States Supreme Court and the Ninth

23   Circuit Court of Appeals, it's my obligation to impose

24   sentencing on you.

25           I've considered a number of matters.  This has been

1    a lengthy proceeding and I've stated all of the things that I

2    have considered.

3           I believe an upward variation under the factors set

4    forth in 3553(a), for the reasons I have stated, is

5    appropriate.  I do not believe that a sentence within the

6    Advisory Guideline range of 235 to 293 months is sufficient.

7    And I think that a sentence of 480 months is a reasonable

8    sentence that is not greater than necessary.

9           Consequently, it is my judgment that you,

10   Richard--William Richard Nielsen, be committed to the custody

11   of the Bureau of Prisons for a term of 480 months.

12          I'm going to recommend that you be allowed to

13   participate in the residential sex offender treatment at a

14   facility designated by the Bureau of Prisons, if you are

15   eligible.

16          I'm also going to recommend that you participate in

17   the 500-hour residential treatment program for drugs and

18   alcohol.

19          When you leave prison, you'll be placed on

20   supervised release for the rest of your life.  Within 72 hours

21   of your release by the Bureau of Prisons, you will report in

22   person to the probation office in the district to which you are

23   released.  While you are on supervised release you are not to

24   commit another federal, state or local offense.  You are barred

25   for the rest of your life from ever being in possession of any

1  kind of firearm, ammunition, or dangerous device as defined by

2  federal law.  You are not to have any controlled substances,

3  including so-called medical marijuana.

4        You are going to have to cooperate in the collection

5  of DNA as directed by the United States Probation Office.  And

6  you are going to have to submit to the sexually transmitted

7  disease testing that was a part of the plea agreement in this

8  case.  And you will do that and abide by whatever the protocol

9  is for--in terms of bodily fluids and otherwise within the next

10 ten days.

11       You'll have to comply with the standard conditions

12 of supervised release.  That will be--there are 15 of them.

13 You need to know them and follow them.  You'll have to comply

14 with the following special conditions:  When you get out,

15 you'll have to participate in and successfully complete a

16 program of substance abuse treatment as approved by the U.S.

17 Probation Office and you will continue in that until you are

18 relieved of the obligation by the Probation Office.  You'll

19 have to pay for the treatment in whole or part, depending on

20 your ability to pay.

21       You'll have to participate in substance abuse

22 testing, and that will include not more than 104 urinalysis

23 tests and not more than 104 breathalyzer tests each year during

24 the balance of your life once you are released.  You'll have to

25 pay for that breathalyzer and urinalysis testing in whole or

1    part, depending upon your ability to pay.

2            I am going to ban you from using alcohol for the

3    balance of your life.  You'll have to abstain from the

4    consumption of alcohol and not enter any establishment where

5    alcohol is the primary item of sale.  This condition supersedes

6    Standard Condition No. 7 with respect to alcohol only.

7            You are going to have to participate in a program

8    for mental health treatment, and that will include assessments

9    for anger control as deemed necessary by the Probation Office

10   and you'll stay in that program until you are relieved of that

11   obligation by your probation officer.  And once again, it's

12   your obligation to pay for that in whole or part, depending on

13   your ability to pay.

14           I am going to require that you enter and complete a

15   sex offender treatment program as directed by, and until you

16   are released from it by the U.S. Probation Office.  You will

17   have to abide by all of the policies of the program; and that

18   will include physiological testing, polygraph and the Abel

19   Assessment and any other requirements.  You'll have to pay for

20   that treatment in whole or part, depending upon your ability to

21   pay.

22           Any employment that you obtain or seek must be

23   approved in writing in advance by the U.S. Probation Office,

24   and you'll have to consent to third-party disclosures of the

25   reasons that brought you here before the Court.

1          You are not going to be allowed to do any of the

2     following without the prior written approval of the United

3     States Probation Officer in charge of your case:  Reside in the

4     home, residence or be in the company of any child under the age

5     of 18.  Go to or loiter near school yards, parks, playgrounds,

6     arcades or other places primarily used by children under the

7     age of 18, or date or socialize with anyone who has children

8     under the age of 18.

9          You are not to possess any materials depicting

10    sexually explicit conduct as defined in 18 U.S. Code 2256(2)(a)

11    Roman i through v, including visual, auditory, telephonic or

12    electronic media, and computer programs or services.  You are

13    not to patronize any place where such material or entertainment

14    is available.  You are not to utilize 900 or adult telephone

15    numbers or any other sex-related numbers.

16         Mr. Nielsen, you are not to possess or use any

17    computer or other device with access to any online service

18    without the prior approval of the Probation Office.  By online

19    service, that means the current technology.

20         The Defendant shall allow the probation officer to

21    make unannounced examinations of your computer, hardware,

22    software; and that may include retrieval and copying of any and

23    all data on that computer.  You'll have to allow the Probation

24    Office to install software to restrict your access and to

25    monitor your access to any Internet or technologically

1    available source.  You are not to possess any encryption or

2    stenography software.  You'll have to provide records of all

3    passwords, Internet service and user identifications, past and

4    present, as well as future, to the Probation Office and you

5    must immediately report any changes.  You are going to have to

6    sign releases that will allow the Probation Office to access

7    phone, wireless, Internet and utility records.

8           You are going to have to comply with the sex

9    offender registration requirements for convicted sex offenders

10   in any state in which you reside.

11          Mr. Nielsen, you are going to have to submit your

12   person, any property you have, house, residence, place of

13   employment, vehicle, papers, computers, and any other

14   electronic communication, data storage devices or media and

15   effects to search at any time with or without a warrant by any

16   law enforcement or probation officer who has a reasonable

17   suspicion concerning a violation of the conditions of your

18   supervised release or unlawful conduct by you.  And you are

19   going to have to allow the probation officer, in the lawful

20   discharge of his supervisory functions, to have access to any

21   and all of those matters, including the search characteristic.

22          You are not to possess a police radio scanning

23   device or any computer hardware or software that would enable

24   you to track or monitor law enforcement activity.  And you are

25   not to purchase, possess, use or distribute or administer

1    marijuana or obtain or possess a medical marijuana card.  This

2    condition supersedes Standard Condition No. 7 with respect to

3    marijuana only.

4           You are going to have to pay restitution in the

5    amount of $7,305 at a rate of not less than 10 percent of your

6    gross monthly income or as otherwise directed by the U.S.

7    Probation Office.  And restitution in this case will be made as

8    directed in the Judgment to the persons named at the address

9    named in the Judgment.  Payment will be made to the Clerk of

10   the U.S. District Court, P.O. Box 8537, Missoula, 59807.  It

11   will then be disbursed to the individuals named in the

12   Judgment.

13          I find you don't have the ability to pay a fine, so

14   I'm not going to impose one.  You do have to pay the special

15   assessment of $100.  That's due and payable immediately.  If

16   you don't have the money to pay that today, you pay it through

17   the Inmate Financial Responsibility Act at the rate of not less

18   than $25 per quarter.

19          Ms. Peterson, is there any legal reason why that

20   sentence should not be the judgment of the Court?

21          MS. PETERSON:  No, Your Honor.

22          THE COURT:  Mr. Donahoe, I know you've objected.

23   Other than your objections and the upward variation, is there

24   any legal reason why the sentence should not be the judgment of

25   the Court?

1          MR. DONAHOE:  Your Honor, only because I don't

2    know--I just want to clarify my record that based on my

3    objections and I guess the complete record, we would argue that

4    the sentence is unreasonable.

5          THE COURT:  Right.  Now, I don't know what the

6    situation is, but as I read the presentence--or, excuse me, the

7    plea agreement, because you objected to the calculations there

8    has not been a waiver of appeal; is that correct?

9          MR. DONAHOE:  Correct.

10          THE COURT:  William Richard Nielsen, the sentence as

11    stated will be the judgment of the Court.

12          Now, Mr. Nielsen, you have a right to appeal my

13    legal determinations in the sentencing and the sentence that

14    was imposed.  If you intend to appeal, you must file a written

15    Notice of Appeal within 14 days of today's date, and that must

16    be with the Clerk of the United States District Court for the

17    District of Montana.  Do you understand that?

18          DEFENDANT:  Yes, sir.

19          THE COURT:  The reason I'm telling you that,

20    Mr. Nielsen, is that if you wanted to appeal any of those

21    issues that I mentioned or any others that relate to the

22    sentencing, if you don't file the Notice of Appeal in writing

23    on time, at the right place, then you are out of luck.  You

24    lose, you waive, you give up the right to the appeal.  Do you

25    understand that?

1          DEFENDANT:  Yes, sir.

2          THE COURT:  You have a right to ask the Court to

3    direct the Clerk to enter a Notice of Appeal on your behalf or

4    you can rely on Mr. Donahoe to perform that for you.

5          Do you want me to direct the Clerk to enter a Notice

6    of Appeal or do you want to rely on Mr. Donahoe?

7          DEFENDANT:  Mr. Donahoe.

8          THE COURT:  All right.  That will be the judgment of

9    the Court.

10          And if there is nothing further, I'm going to remand

11    you to the custody of the Marshals.  I am going to make, if it

12    hasn't been filed--is Dr. Scolatti's report a part of the

13    sealed record in the case?

14          MS. PETERSON:  I don't believe it has been yet, Your

15    Honor, but I would request it.

16          THE COURT:  It is going to be made a part of the

17    record.  By sealing, it will be placed along with the Montana

18    Ninth Judicial District Court Findings of Fact and Conclusions

19    of Law and Dispositional Order.  Those two items will be filed

20    under seal, accessible to counsel, and to nobody else without

21    an order of the court.

22          Thank you, Counsel.  And we will be in recess.

23          (Court concluded at 1:29 p.m.)

24

25

1                   C E R T I F I C A T E

2    STATE OF MONTANA    )
                         )  ss.
3    COUNTY OF MISSOULA  )

4           I, Julie M. Lake, RDR, CRR, CSR, Freelance Court
     Reporter for the State of Montana, residing in Missoula,
5    Montana, do hereby certify:

6           That I was duly authorized to and did report the
     proceedings in the above-entitled cause;
7
            I further certify that the foregoing pages of this
8    transcript represent a true and accurate transcription of my
     stenotype notes.
9
            IN WITNESS WHEREOF, I have hereunto set my hand on
10   this the 8th day of August, 2011.

11
            _Julie M Lake_____
12           Julie M. Lake, RDR, CRR, CSR
             Freelance Court Reporter
13           State of Montana, residing in
             Missoula, Montana.
14

15

16

17

18

19

20

21

22

23

24

25