IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

UNITED STATES OF AMERICA,          ) Cause No. CR 11-8-M-DWM
                                   )
        Plaintiff,                 )
                                   )
        -vs-                       )
                                   )
WILLIAM RICHARD NIELSEN,           )
                                   )
        Defendant.                 )
                                   )


Taken at 201 East Broadway
Missoula, Montana
Friday, November 16, 2012 - 10:00 a.m.


Transcript of Proceedings heard before the
Honorable Donald W. Molloy


Reported by Jennifer Wells, Jeffries Court Reporting, Inc., 1015
Mount Avenue, Suite C, Missoula, Montana  59801, (406) 721-1143,
Freelance Court Reporter residing in Missoula, Montana.

1              A P P E A R A N C E S

2  Cyndee Peterson, Assistant U.S. Attorney, Assistant U.S.
   Attorney's Office, 105 E. Pine, Second Floor, Missoula, Montana
3  59802,
        appearing on behalf of the Plaintiff.
4
   Michael Donahoe, Senior Litigator, Federal Defenders of Montana,
5  104 Second Street  South, P.O. Box 3547, Great Falls, Montana
   59403-3547,
6        appearing on behalf of the Defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      Friday, November 16, 2012

 2          THE COURT:  Be seated, please.  Would you call the next

 3   matter on the calendar.

 4          THE CLERK:  This is the time set for resentencing in

 5   CR 11-8-M-DWM, the United States of America versus William

 6   Richard Nielson.

 7          THE COURT:  Good morning, Ms. Peterson.

 8          MS. PETERSON:  Good morning, Your Honor.

 9          THE COURT:  Have you read the updated amended presentence

10   investigation report that was prepared following the Ninth

11   Circuit's decision of September 12th of this year?

12          MS. PETERSON:  Yes, Your Honor.

13          THE COURT:  Do you have any objections to the presentence

14   investigation report?

15          MS. PETERSON:  No, sir.

16          THE COURT:  Are you going to make a motion on the 3E1.1(b)

17   for the acceptance of responsibility?

18          MS. PETERSON:  Yes, Your Honor.

19          THE COURT:  That motion is granted.  Any other motions

20   you're anticipating?

21          MS. PETERSON:  No, Your Honor.

22          THE COURT:  I do believe that I sent out notice indicating

23   I contemplated making an upward variation.

24          MS. PETERSON:  I do, Your Honor.

25          THE COURT:  Do you need any more time to deal with that?
```

```
 1        MS. PETERSON:  No.

 2        THE COURT:  Good morning, Mr. Donahoe.

 3        MR. DONAHOE:  Good morning, Your Honor.

 4        THE COURT:  Have you read the presentence investigation

 5   report as it relates to William Richard Nielsen?

 6        MR. DONAHOE:  Yes.

 7        THE COURT:  Has William Richard Nielsen read the new

 8   presentence investigation report?

 9        MR. DONAHOE:  I have gone over and explained the changes to

10   him, yes.

11        THE COURT:  So have you gone over it in detail with him?

12        MR. DONAHOE:  Yes.

13        THE COURT:  Do you have any objections to the presentence

14   investigation report?

15        MR. DONAHOE:  No, except for the comment about the sex

16   offender treatment program and his willingness.

17        THE COURT:  Right.  And that comment is set forth in

18   paragraph 9.

19        MR. DONAHOE:  9 I think, yes.

20        THE COURT:  Right.  And it doesn't have anything to do with

21   any sentence that I would impose.  I think it's information.

22   Ironically, I think the guideline books that just came out

23   indicate that the commission has made a change that

24   post-sentencing conduct can be considered in -- when there's a

25   resentencing, but I don't think that applies here.  And in any
```

```
 1  event, I'm not taking that into account in terms of what I think
 2  is a reasonable sentence in the case.  So I have given notice I
 3  am contemplating an upward variation.  Do you and Mr. Nielsen
 4  need any more time to prepare to deal with that issue?
 5      MR. DONAHOE:  No.
 6      THE COURT:  Do you have any objections -- I think I asked
 7  you that, but other than do you have objections that I need to
 8  rule on?
 9      MR. DONAHOE:  No, Your Honor, I don't.
10      THE COURT:  All right.  Well, for purposes of the record,
11  then, I'm going to accept the presentence investigation report
12  as amended after the Ninth Circuit's decision, which faulted my
13  reasoning in the application of the vulnerable victim to a
14  12-year-old girl that was enticed by Mr. Nielsen to come up here
15  where he repeatedly raped her, that she wasn't vulnerable.  And
16  I am uncertain if that opinion says the guideline can never be
17  applied or if it says my reasoning wasn't good enough.  I will
18  accept the latter.
19      And then I was faulted also for including in his criminal
20  history his prior sex offense when he was 15 or 16 years old in
21  Pend Oreille -- or Pondera County.  And that was a conviction
22  that he was required to be a registered sex offender for.  And
23  the Circuit reasoned that you can't count juvenile convictions,
24  apparently, for calculating his -- for the application of the
25  criminal history.  And so for those two reasons they reversed
```

```
1   it.  I think there was a challenge as to the reasonableness of

2   the sentence, which was left unanswered.

3       So I am accepting the plea agreement and I have given

4   notice that I am -- and I will make an upward variance in this

5   case for the reasons I will state.  And as we all know, the

6   things that we say orally we think are perfectly logical until

7   you read a transcript, and there are always things that are not

8   what you planned to say and there are always instances that

9   there are things that you wish you had said in order to make a

10  more complete record.  And to alleviate that from being an issue

11  in the fact that I have given notice, I will orally pronounce

12  the sentencing and my reasoning, but I fully intend to do, for

13  want of a better term, findings of fact in an effort to fully

14  flesh out what my reasoning is in making an upward variation in

15  this case.  And so I will try and be as clear as possible this

16  morning.  But I am also going to be providing a written

17  justification for the sentence.

18      So if there are no legal issues to rule on, Mr. Donahoe, I

19  will give you an opportunity to speak on behalf of Mr. Nielsen.

20  He can join you.  I will give him an opportunity to speak before

21  calling on Ms. Peterson.

22      MR. DONAHOE:  Thank you, Your Honor.  I really don't have a

23  lot this morning.  I guess through the appeal process I did stay

24  in touch with Mr. Nielsen and sort of kept track of his

25  whereabouts.  He did land in Tucson in the facility there and we
```

1   stayed in pretty close contact on the telephone.  I think he has

2   made progress at the institution.  And as the amended reports

3   notes, he's not really suffered any discipline problems.  He has

4   a job in the kitchen.  In the way of a physical issue, he broke

5   his glasses a little bit ago and was unable to replace the lens.

6   So he has a hard time seeing, actually, and has to read up close

7   and is suffering from headaches.  I don't think that that has

8   anything to do with what we're doing this morning.  I just

9   wanted to make an observation that he seems to be suffering

10  under that condition.

11       Your Honor, I would please urge the Court to give a

12  guideline sentence in this case.  I respectfully submit that

13  it's somewhere in that range.  I might even concede the top end

14  of it would be sufficient, but not greater than necessary.  And

15  I say for a couple of reasons.  First, as indicated, I have kept

16  in touch with Mr. Nielsen.  I think he's doing his best to adapt

17  to an incarceration setting.

18       He does, in fact, intend to engage in the sex offender

19  treatment program.  He will do that both in the institution at

20  an appropriate time.  He's just too far in the beginning of his

21  sentence to matriculate into the system now.  He has completed

22  the drug program.  He has done that, has that under his belt.

23  And I think he's making a good effort to do this time.  And in

24  speaking with him, I think the incarceration is starting to have

25  an effect.  He has incentive for release.  He looks to the day

1  when he can get back into society.  And I think he's going to

2  take full advantage of the programs available to him.  So

3  hopefully to make him a law abiding and better citizen when he

4  is released.

5      He's a young man.  I think he has some potential.  I know

6  his background is difficult and in some ways works against him

7  for reasons that maybe are his own fault.  But I believe that

8  there is redemption for anybody that tries hard enough.  And I

9  think he's starting to display the willingness to do that.  I

10 hope the best for him, and I have told him that.  And I have

11 tried to orient him in a positive way.  And I guess, in

12 conclusion I just want Your Honor to know I think he's starting

13 to respond to that.  He's keeping to himself at the institution.

14 He likes the fact that he has a job.  He was working in the

15 kitchen at Tucson.  So I think he's adapting and his promise for

16 the future would please warrant a sentence within the guideline

17 range.

18     Thank you.

19     THE COURT:  Thank you, Mr. Donahoe.

20     William Richard Nielsen, you have a right to speak on your

21 own behalf before I impose sentence on you.  Would you like to

22 exercise that right?

23     THE DEFENDANT:  Yes, Your Honor.

24     THE COURT:  You may proceed.

25     THE DEFENDANT:  All I can say is I know I screwed up.  I am

1    extremely sorry for what I have done, and I plan on working the

2    best I can to make myself better while I'm incarcerated.

3         THE COURT:  Anything else?

4         THE DEFENDANT:  No, Your Honor.

5         THE COURT:  All right.  You and Mr. Donahoe may be seated.

6         Ms. Petersen.

7         MS. PETERSON:  Thank you, Your Honor.  The Court had

8    previously found that the guideline range at the prior

9    sentencing, which is 235 to 293 months, was insufficient and

10   varied up 480 months in this case.  And government would argue,

11   Your Honor, how much more so is 188 to 235 insufficient based on

12   all of the prior reasons that the government set forth.  And we

13   would incorporate those comments that were made at the prior

14   sentencing.  And all of the reasons previously cited by the

15   Court, 480 months is the sentence that is sufficient, but not

16   greater than necessary in this case.  I don't want to go back

17   through and reiterate everything, Your Honor, because I know

18   that you're familiar with the record.  It's difficult because

19   obviously when we're at this stage now it's easier to minimize

20   the effect on the victim and the heinous nature of the crime.

21   And I don't want the Court to do that, and frankly, I don't

22   think the Court will.  But I would specifically ask that the

23   Court would incorporate all of the prior reasons, all of the

24   issues that were relayed in the evaluations, including the

25   reasons that were made to the defendant's history and conduct,

1   the impact on the victim and to impose the same sentence that

2   was previously imposed.

3       The one thing that I would ask the Court to do, Your Honor,

4   is address -- I believe there were three things that were

5   brought up in the appeal when the defendant challenged the

6   sentence as being unreasonable.  There are issues that were

7   pointed out that can now be corrected.  And in case there is

8   another appeal, I would like the record to be clear on those

9   three things.  One of them that was challenged was that the

10  Court -- the defendant was talking about how the Court's reasons

11  were repetitious and exaggerated.  And he had stated -- the

12  Court stated that the Scolatti report characterized appellant as

13  a, quote, high-risk to re-offend.  But the report actually

14  states that the risk to re-offend is moderate high.

15      I believe that what the Court was talking about is that

16  based on the violence recidivism scale, Mr. Nielsen falls in the

17  highest third for offenders on violent crime.  But the risk

18  designation on the special recidivism rate is moderate to high.

19  So I would ask that the Court clarify that it was referencing

20  the violent sex and the violent recidivism rates when you were

21  referencing that he falls into the upper third.

22      The second challenge was from the quote -- was from the

23  Court's quote saying that it is also coming from Dr. Scolatti's

24  report.  The Court's statement was, It's highly unlikely that

25  Mr. Nielsen is likely to learn from his experience.  And the

1  defendant challenged that nothing in Dr. Scolatti's report said

2  that.

3      Dr. Scolatti's report says, and I quote, He is not likely

4  to learn from experience.  So in the event that there's any

5  difference between the Court saying that it's highly unlikely

6  and he is not likely to learn from experience, I would ask that

7  the Court make that clear.

8      And the third one is that the Court stated erroneously,

9  again, because I think the Court was approximating, but the

10  Court made the statement that the defendant was 15 years older

11  than the victim.  And actually, the defendant is 11 and a half

12  years, approximately, older than the victim.

13      So the government would ask the Court to clarify those

14  specific things on the record, impose the same sentence relying

15  on all of the reasons that were previously stated.

16      Thank you, Your Honor.

17      THE COURT:  All right.  Thank you.  Well, one thing I

18  hadn't done was to go over the statutory and guideline

19  provisions prior to allocation, but I don't think it

20  procedurally makes a difference.

21      And if you think it does, Mr. Donahoe, I will give you

22  another bit at the apple.

23      MR. DONAHOE:  No.  I'm fine.

24      THE COURT:  All right.  The statutory provisions are that

25  Mr. Nielsen can be incarcerated for no less than 10 years.  The

1  maximum sentence is life imprisonment.  Under the revised

2  presentence investigation report that was prepared after the

3  Ninth Circuit's opinion in reversing the case is now 188 months

4  to 235 months.

5       With respect to probation, by statute Mr. Nielsen cannot

6  receive probation.  The guidelines advisory and character

7  indicate probation is not available.

8       Supervised released for Mr. Nielsen by statute can be no

9  less than five years.  It can be up to life.  The guideline,

10 advisory in nature, recommend five years to life in prison.

11      And by statute he could be fined up to 250,000.  The

12 guideline range is 20,000 to 200,000.

13      By statute restitution is available.  And I believe that

14 Mr. Donahoe in his pleadings indicated that he did not have any

15 difficulty with the concept of restitution, as long as there was

16 justification.  It's my understanding that the restitution is

17 $2,305, which is the amount of travel and counseling for the

18 mother and father of the victim.  And that the guidelines, if

19 statute authorizes the $2,305, so do the guidelines.

20      He has to pay a $100 special assessment by statute and

21 under the guidelines.

22      It will cost roughly $29,000 for each year that Mr. Nielsen

23 is incarcerated, with an additional 3500 for each year of his

24 supervised release.  If he were sentenced within the advisory

25 guideline range of 188 to 235 months, it would cost the American

1   tax payers between $452,700 and $566,000.  Those are rough

2   numbers.

3       Supervised released would at least be $17,166, and it's

4   going to be for life.  So it's roughly $3500 for each year

5   Mr. Nielsen lives after he gets out of prison.

6       So I had not done that earlier when I usually do, but,

7   Ms. Peterson, is that an accurate statement of the statutory

8   guidelines and provisions?  And if you would, address the

9   restitution.

10      MS. PETERSON:  Yes, Your Honor, I will.  That is an

11  accurate statement and the government has no objections to it.

12  The restitution is not for any counseling or therapy.  That has

13  been withdrawn from the victim's request.  The restitution is

14  specifically $1705 for the father, and $600 for the mother.  And

15  that was for their expenses in coming up to rescue their

16  daughter.

17      THE COURT:  The 600, was that for her counseling or was

18  that for --

19      MS. PETERSON:  No.  Those were for the mother's expenses

20  that were incurred coming up to Montana.

21      THE COURT:  All right.  Mr. Donahoe, as far as the

22  restitution is there an issue?

23      MR. DONAHOE:  No, Your Honor.  I had notice of that

24  yesterday, that number.  And we have no objection to that.

25      THE COURT:  All right.  Thank you.

```
 1        Well, I think that the request of the United States that I
 2   clarify the issue of Dr. Scolatti's moderate to high and the
 3   violence category versus the sexual recidivism and his
 4   determination, as well as my characterization of what he said
 5   concerning whether or not the defendant was unlikely to learn,
 6   as opposed to my reference and the age distinction between
 7   Mr. Nielsen and a 12 year old is a reflection of what I said at
 8   the beginning of this.  When imposing a sentence when I spend
 9   the evening and the day before reading presentence investigation
10   reports and reflecting on it, and in this case, of course,
11   having a great deal of time after the Ninth Circuit opinion to
12   reflect on the sentence that is sufficient, but not greater than
13   necessary, and then reflecting on what I said, what I intended
14   to say, and what I should have said, points out why I think it's
15   important that I write out specifically what my reasoning is in
16   this case.  Because sometimes, even though I attempt to engage
17   my brain before my tongue, oftentimes it doesn't come out at
18   least the way I think I was going to say it.
19        Ms. Peterson is absolutely correct in her characterization
20   of the three issues that she has raised.  And I will make sure
21   in my written justification for the sentence that I'm going to
22   impose that that is clearly reflected.  With that in mind, I am
23   going to sentence William Richard Nielsen to 480 months.  I do
24   not believe a sentence within 188 to 235 months is sufficient
25   given all of the information that is available concerning
```

1  William Richard Nielsen, the nature and circumstances of the

2  offense and the history and characteristics of William Richard

3  Nielsen.

4      In this case, Mr. Nielsen met a 12-year-old girl through a

5  phone service called Lavalife, L-A-V-A-L-I-F-E.  In the

6  conversations, however the victim got on that website, whatever

7  representations she may have made, in the course of her initial

8  contact and sexting with Mr. Nielsen, he was made aware that she

9  was 12 years old.  Despite knowing that she was 12 years old and

10 having told her he was a convicted sex offender, he proceeded --

11 they proceeded to engage in phone sex.  Mr. Nielsen then

12 encouraged the victim, who was 12 years old, to come to Montana

13 with representations that they would -- he would provide her

14 drugs and a good time.  He promised her marijuana and he

15 promised her a good time.  He told her what, I think, roughly

16 the cost of $110 to get a bus ticket and encouraged her to do

17 that.  She had $50 from her father, stole $50 from her mother,

18 bought a bus ticket and used Mr. Nielsen's last name, came to

19 Missoula on January 5th of 2011.

20     Mr. Nielsen, a convicted sex offender, met her at the bus

21 station and then took her to his apartment, which was not that

22 far away, immediately began smoking marijuana and then engaged

23 in sex with her.

24     Over the next four days Mr. Nielsen admitted having sex

25 with a 12-year-old girl several times a day.  He admitted to

1  slapping her -- this is a quote -- tits, breasts, ass, and

2  vagina, end quote.  He also admitted to biting her, quote, ass,

3  tits and neck, end quote.  Mr. Nielsen referred to this

4  12-year-old girl as his, quote, little fuck pet, end quote.  And

5  either asked or insisted that she call him, quote, daddy, end

6  quote.

7       In the repeated rapes of this child, Mr. Nielsen did not

8  use any sort of condom until she began bleeding.  There is a

9  suggestion by Mr. Nielsen she was bleeding because of her

10 period.  There is contrary evidence to indicate she was bleeding

11 because of the violence and repeated sex she had been exposed to

12 with Mr. Nielsen.

13      In interviews with police officers Mr. Nielsen was asked

14 what his plan was with this child.  And he told the interviewing

15 officers that in all likelihood his conduct would have continued

16 until she was 18 years old.

17      It is reflected in the presentence report the statement of

18 the victim's mother, the horror of her finding her daughter

19 naked in his bed, having repeatedly been raped, and encountering

20 a door that had locks on both sides of the door, so that

21 Mr. Nielsen had the capacity to lock her in when he was out of

22 the place and to keep her in when he was in the place.

23      The sex that he engaged in involved sexual intercourse,

24 oral sex, and digital manipulation of various orifices on that

25 child's body.

1    Mr. Nielsen at the time, I believe, was 24 years old.  At

2  the time he was supposedly 6 foot 4 or 6 foot 3, and weighed

3  roughly 370 pounds.

4    When confronted initially after the parents arrived and

5  found their daughter, Mr. Nielsen lied, stating that somebody

6  named Bill had dropped her off at his apartment and asked her

7  to -- asked him to watch the child for a couple of days.  He

8  insisted that the child advised him she was 18 years old.  And

9  then subsequently in his interrogation admitted the reality of

10 what had occurred.

11   When the parents came frantically looking for their child

12 and found him through efforts -- concerted efforts on behalf of

13 the family and with the help of friends, they found her in

14 Nielsen's apartment laying naked on his bed.  According to her,

15 he had drugged her to the point that she had, quote, You drugged

16 me up to the point I had no control over myself.

17   She was taken to St. Patrick's Hospital in Missoula,

18 Montana, and had abrasions on her back, pain in her head, pain

19 in her lower back, and her wrists were bruised and tender.

20   Mr. Nielsen, in the course of being interviewed, refers to

21 himself as a, quote, light sadist, end quote.  And quote, a bit

22 of a masochist, end quote.  He admitted he had not used any kind

23 of condom until she began bleeding, but as I have earlier

24 indicated, he acknowledged that having sex with her repeatedly

25 over the period that she was kept in his apartment may have been

1  the reason for the trauma to her vagina and the bleeding which

2  occurred.

3      With respect to the light sadist and bit of a masochist, as

4  well as with respect to Mr. Nielsen's background, when you look

5  at his criminal history, not for purposes of scoring, but for

6  purposes of trying to ascertain his background and who he is,

7  his violence begins when he was 12 years old.  When he was 13,

8  he was involved in more violence, involving the police who were

9  called to a school because of an altercation with another

10 student.  And at that time, when he was 13 years old, he was

11 still extraordinarily big for his age.

12     But when he was 15, he sexually assaulted his half-sister.

13 And what he did was -- she advised a counselor that he had raped

14 her, not by virtue of inserting his penis in her vagina, but by

15 engaging in oral and digital sex.  She advised that this

16 occurred because somehow Mr. Nielsen had discovered that his

17 stepsister had been physically either abused or engaged in sex

18 with somebody that was a friend of her mother.  And Mr. Nielsen

19 threatened her that he would he expose her past if she did not

20 engage in some sort of sexual behavior with him.  And what

21 occurred is that Mr. Nielsen convinced her to go into his

22 bedroom where she lay on the bed, and then Mr. Nielsen proceeded

23 to sexually assault her by touching her in her genital and

24 vaginal area with his fingers, then removing her undergarments

25 and engaging in oral sex with his half-sister.  This was brought

1    to the attention of the mother who indicated to him that he

2    would be sent away if he did not alter his ways.  When he ended

3    up being sent away for that behavior, then he was released at

4    the age 18 and did not register as a sex offender.  And had a

5    conviction where he got a suspended sentence of five years for

6    failing to register as a sex offender.

7         But the record indicates that Mr. Nielsen was not finished

8    with his aberrant -- or deviant would be a better word, sexual

9    behavior.  When he was 24 years old, in July of 2010, which was

10   roughly six months before this incident, there was an issue

11   concerning two women going to his residence.  And it is in the

12   record that Mr. Nielsen tried to convince one of the two women

13   or perhaps both of them to engage in what was referred to as a

14   threesome.  And that an incident occurred where Mr. Nielsen,

15   while one of the woman was showering, sexually assaulted the

16   other woman by, according to the woman, squeezing her boobs and

17   grabbing her vagina.  He stopped at some point.

18        And then the other woman indicated that Mr. Nielsen had

19   suggested that they have a threesome.  She had met Mr. Nielsen

20   online, as the child in this case did.  And she had an intimate

21   relationship with Mr. Nielsen.  And that relationship, whether

22   she persisted in her view or altered her view, her statements

23   were relatively consistent that she was sexually assaulted by

24   Mr. Nielsen on a number of times.  When she was sleeping he

25   would abuse her or attempt to engage in sex against her wishes.

1   And that Mr. Nielsen had, according to her, a fantasy of wanting

2   to play rape.  He would pin her down and then engage in sexual

3   intercourse.  And according to this woman, she was forced to be

4   a sex slave.  And indeed, the record reflects that she signed a

5   contract prepared by Mr. Nielsen that he obtained from the

6   Internet indicating the terms of the sexual slavery agreement.

7       There is some dispute as to what actually occurred

8   concerning the effort at threesomes, but the woman who was

9   apparently the sex slave altered her view and basically went to

10  the police and indicated she deserved what happened and told the

11  police that she had signed a contract before moving in with

12  Mr. Nielsen where she was going to be a sex slave.  She

13  indicated that she consented to the sexual relationship, but

14  that they had recently broken up and had a relationship of,

15  quote, friends with benefits, end quote.

16      She met Mr. Nielsen on Lavalife, and he was paying to have

17  phone sex.  However, she moved to Missoula at the age of 18,

18  entered the slave contract with Mr. Nielsen.  And in that

19  relationship he required her to refer to him as, quote, master.

20  And when in the master's presence she could not wear a bra, and

21  she had to ask Mr. Nielsen permission for anything and was

22  responsible for his sexual gratification.  They discussed,

23  quote, safe words, end quote, that they would use during sexual

24  play.  But that her report was that Mr. Nielsen had this play

25  rape fantasy that he wanted to act out.  And her suggestion was

1  that the safe words were not responded to with the immediacy

2  that they had as an understanding.

3      Mr. Nielsen engaged, I think, in some significant violence

4  that was reported by another tenant in the same building, where

5  this slave woman was shoved and punched.  And that it was

6  reported that Mr. Nielsen was observed running at the slave

7  woman and smashing her into the walls, and she was without

8  clothing, trying to push him away.  And then later reported to

9  the woman who -- or reported to the woman that called the police

10  about this master-slave relationship that she had with

11  Mr. Nielsen.  Other persons reportedly heard the woman saying,

12  Stop doing that.

13      There are a number of evaluations that have been done on

14  William Richard Nielsen by various psychologists that are

15  reflected in the presentence report.  And I will refer to them

16  in the written materials that I provide as a justification for

17  the sentence.  But when I read both the information in the

18  presentence report and the evaluations that have been provided

19  to me, particularly that of Dr. Scolatti, I think it is

20  important to say or quote what Dr. Scolatti had to say.

21      Mr. Nielsen approached the evaluation with a combination of

22  openness and wariness.  He is no stranger to the criminal

23  justice system and his responses to the inquiries demonstrated

24  his knowledge and awareness.  That is, he appeared to be very

25  candid and open with discussing material that would not get him

1  into trouble, information that was already known about him or

2  historical data which did not present him in a negative light.

3  However, he was much more reticent to divulge any information

4  that might be incriminating to his current case or past criminal

5  actions.  For example, he denied his adolescent offense against

6  his sister and backpedaled on the current offense regarding

7  incriminating information he disclosed during his law

8  enforcement interview.  Rarely did Mr. Nielsen take full

9  responsibility for any of his transgressions.

10      In assessing the possibility that Mr. Nielsen falsely

11  admitted elements of his offense to the detective working this

12  case, according to Dr. Scolatti and the information available to

13  him, there is no evidence to substantiate the assertion.

14      Dr. Scolatti noted that psychological testing indicated a

15  plethora of problems.  While there is no doubt Mr. Nielsen has

16  psychological problems, his over-endorsement of pathological

17  items makes it difficult to sort the, quote, wheat from the

18  chaff, end quote.  Suffice it to say, the MMPI-2RF was

19  technically invalid due to his pathological response style.

20  Other personality instruments also reflected his expressed

21  emotional distress and were not rendered invalid.

22      Dr. Scolatti, of course, in a very lengthy report went on

23  to state Mr. Nielsen has a significant antisocial personality

24  disorder, with prominent borderline and schizoid features.  The

25  essential maladaptive personality features are a pension for

1   stimulus variety and excitement, and an inability to tolerate

2   boredom and routine.  This prompts him to be impulsive,

3   irresponsible, negativistic and unpredictable.  Central to his

4   personality disorder is Mr. Nielsen's risk taking and

5   impulsiveness behaviors.  Risk taking is often carried out for

6   itself for the excitement it provides for the sense of feeling

7   alive and engaged in life, rather than for purposes such as

8   material gain or status in a peer group.  Mr. Nielsen responds

9   before thinking, acting impulsively and behaving in an

10  unreflective, uncontrolled manner.

11      Beyond his inability to control his behaviors and feelings,

12  Mr. Nielsen appears to be substantially fearless, undaunted by

13  events that most people experience as dangerous and frightening.

14  And he gives evidence of venturesomeness that appears blind to

15  the potential serious consequences.  His risky behavior is

16  foolhardy, not courageous.

17      When Mr. Nielsen was earlier evaluated in 2002 by Barbara

18  Bottomly, she found, based on testing results from the MMPI,

19  that Mr. Nielsen had serious impulse control problems.  He had

20  low frustration tolerance, and the need for constant stimulation

21  caused him to behave recklessly and irresponsibly, that he was

22  uninhibited and self-indulgent.  He had an exaggerated sense of

23  self that boarded on grandiosity.  And that two significant

24  factors, a natural ability to charm, persuade or even con

25  others, and he had numerous misanthropic attitudes.

 1      And her finding was that his characteristics, as evidenced

 2  by the MMPI reflected a person not -- that is a poor candidate

 3  for traditional psychotherapy.  When she administered the

 4  Buss-Durkee test in 2002, which is a measure of hostility, there

 5  were several categories.  Mr. Nielsen, at that time, had an

 6  overall score of 45.  And the cutoff for that particular

 7  evaluation is 38.  The characteristics under resentment, the

 8  high score for the test is four, the defendant's score was 5.

 9  Under indirect hostility the high score was 6, and the

10  defendant's score was 8.  Under the category of assault the high

11  score is 6, and the defendant's score was 8.  Under suspicion

12  the high score is 4, and the defendant's score was 7.  Under

13  verbal hostility the high score was 9, and the defendant's score

14  was 9.

15      She found there were other issues with Mr. Nielsen, which

16  were consistent with the later findings, in my opinion, of Dr.

17  Scolatti, which are very troublesome.  And that is

18  Mr. Nielsen's -- she characterized them as critical items that

19  should be followed up on -- his desire to get hurt and his

20  desire to get in fights.  And she apparently felt that he

21  suffered from many behavioral problems, that testing revealed --

22  suggested aggression verbally and physically, as well as

23  indirect hostility.

24      In that evaluation by Ms. Bottomly there were also

25  instances of Mr. Nielsen's incapacity to abide by the truth,

 1  even when confronted, and his propensity to prevarication by

 2  changing his view or representations of what had occurred in his

 3  sexual misbehavior.  In the incident that she was describing

 4  Mr. Nielsen made excuses and said that his sexual offense

 5  happened because the person, I.E., his sister -- stepsister --

 6  or half-sister, excuse me, was so curious and interested in sex.

 7  And then, of course, attributed his sexual deviation to his

 8  family.

 9      There are many other aspects of Dr. Scolatti's report where

10  he says in one part that sexually two diagnostic classifications

11  pertain to Mr. Nielsen, sexual sadism and paraphilia.

12  Paraphilia focused on sexual sadism involves acts -- real, not

13  simulated -- in which the individual derives sexual excitement

14  from the psychological or physical suffering, including

15  humiliation of the victim, which is entirely consistent with the

16  sex slave that he contracted with and with his abuse of the

17  child victim in this case.

18      Some individuals with this paraphilia are bothered by their

19  sadistic fantasies, which may be invoked during sexual activity,

20  but not otherwise acted on.  In such cases the sadistic

21  fantasies usually involve having complete control over the

22  victim who is terrified by anticipation of the impending

23  sadistic.  Others act on sadistic sexual urges with a consenting

24  partner, parenthetically, who may have sexual masochism, who

25  willingly suffers pain or humiliation.  Sadistic fantasies or

1  acts may involve activities that indicate the dominance of the
2  person over the victim.  In order words, forcing the victim to
3  crawl or keeping the victim in a cage.  It may also involve
4  restraint, blindfolding, paddling, spanking, whipping, pinching,
5  biting -- excuse me, beating, burning, electrical shocks, rape,
6  cutting, stabbing, strangulation, torture, mutilation or
7  killing.
8       Mr. Nielsen's sexual behavior with the victim in this case,
9  as well as his self-reported interest in sadomasochist
10 activities has been present for over a period of at least six
11 months.  During this time he has engaged in recurrent, intense
12 sexually arousing fantasies, sexual urges and behavior involving
13 acts in which the psychological or physical suffering, including
14 humiliation, of the victim was sexually exciting to him.  He has
15 acted on these sexual urges with a nonconsenting person.  And
16 the sexual urges and fantasies have caused marked distress and
17 interpersonal difficulty for him.
18      In addition, Mr. Nielsen has a paraphilia not otherwise
19 specified, involving hebephilia.  Hebephilia is not a separate
20 diagnostic, but rather it is a subcategory which is
21 characterized by persistent sexual interest or sexual activity
22 with young 13- to 16-year-old adolescents, and the adult person
23 is more than five years older than the teenager.  In his
24 interview with police Dr. Scolatti reports Mr. Nielsen
25 acknowledged sexual contact with three 15-year-old girls since

1   he has been 18 or older than 18.

2       As is pointed out by Ms. Petersen, Mr. Nielsen, according

3   to Dr. Scolatti, is a moderate to high risk to re-offend.  And

4   Dr. Scolatti says, From my examinations of Mr. Nielsen I did not

5   find many redeeming qualities and a poor potential for sustained

6   rehabilitation.  Given his significant antisocial psychopathic

7   traits, he is a poor candidate for treatment from a

8   rehabilitative perspective.

9       The consequences of this act, with respect to the child

10  that he raped repeatedly, is reflected in her indication that

11  she has now experienced constant flashbacks and fear from the

12  raping.  And that she is suicidal, because that's the only way

13  she can escape flashbacks.  Her mother, in a very poignant

14  victim's statement, talks about what it was like for her, the

15  mother of the 12 year old, to know that her child is gone and

16  not knowing whether the child was alive or dead, the nightmares

17  that reoccurred and continue to reoccur, the hopelessness and

18  frantic ability -- efforts, not ability, searching for her

19  daughter day and night; the toll that it took on them physically

20  in not knowing if their child was dead or alive; the effort to

21  contact police, missing and exploited children databases, bus

22  stations, organizations, family members; and then finally

23  tracking her down and coming to Missoula with the child's

24  father.  And to quote her, It was devastating, even more

25  devastating was the fact that she was found with a 24 year old

1  prior sex offender, William Nielsen.  I walked into William

2  Nielsen's apartment and I saw my 12 year old lying naked on his

3  bed as he cursed at her to get up, saying her name, to get up

4  and put -- this is a quote -- quote, her name, get up and put

5  some fucking clothes on, end quote.  And as the mother stated,

6  that is a sight and experience that no parent should have to see

7  or want to see.  She still has, in her words, I still go back in

8  my nightmares and see the lock that locked from both sides and

9  imagine my little girl trapped inside.  She continues to have

10 flashbacks and reports that her daughter, this child, has

11 attempted suicide and struggles every day with the effects of

12 this crime -- the effect this crime has had on her.

13      And the child's father very poignantly said in response to

14 the impact on him, quote, We all lost our little girl, period,

15 my baby, end quote.

16      When I consider the nature and circumstances of the offense

17 and the history and characteristics of William Richard Nielsen,

18 as I have articulated here and will articulate in a written

19 finding, it is my opinion that based on his history and his

20 characteristics and the nature and circumstances of this

21 offense, that imposing a sentence within the guideline range of

22 188 to 235 months would be woefully inadequate and insufficient.

23 I believe based on that factor alone of 3553(a) that a sentence

24 of 480 months is sufficient to accomplish the goals of

25 sentencing as it relates to the first characteristic.

1        There is a need for the sentence imposed to reflect a

2   seriousness of the events and to promote a respect for the law

3   and to provide just punishment for the offense.  Mr. Donahoe has

4   articulated in this instance Mr. Nielsen is beginning to get it,

5   that he has completed the drug program, which is kudo for him,

6   that incarceration is beginning to have an effect, that he still

7   is young.  And Mr. Donahoe has articulated the concept that he

8   believes in redemption and that everybody has a prospect of

9   redemption if simply given the opportunity.

10       When I consider the argument of redemption and its

11  prospect, given his history, and I try and balance those against

12  the seriousness of the offense he is, in my view -- and I think

13  it is reflected in the records -- a predator.  And if you look

14  at the instances of using this Lavalife, whatever that program

15  is, to entice a 12 year old to engage in this horrific rape and

16  sexual assaults.  And I understand the Ninth Circuit's opinion,

17  that a 12-year-old girl, as I had previously articulated, is not

18  a vulnerable victim.  I was perhaps inarticulate in my

19  expression of what the facts are.  And my reasoning apparently

20  was faulty, and so I have not included that as any factor in

21  terms of calculating the guidelines.  My experience is simply

22  that 12-year-old boys or girls are extraordinarily susceptible

23  and vulnerable to influence by those who are older than they

24  are.

25       And here Mr. Nielsen was indeed -- that he was 24 and she

1   was 12.  Apparently that's an 11 and a half year difference

2   based on birth dates.  And I had incorrectly stated he was 15

3   years older, which was perhaps loose language that didn't

4   express what I intended to say.  Nonetheless, a 24-year-old man

5   and a 12-year-old girl, he is going to obviously be able to

6   influence her, as he did in this case, and entice her.

7        And using the Internet, which is readily available to

8   anybody who has cell phones and all of these digital things that

9   enable people from the highest generals in the land to the

10  children in the land, to engage in inappropriate sexual

11  behavior.

12       I can't, in my mind, fathom more offensive conduct with

13  children than what Mr. Nielsen engaged in here, unless it is

14  homicide.  He repeatedly raped her.  And it was all basically

15  for his gratification and sexual gratification and excitement.

16  And the language he used, the things that he admitted doing, the

17  biological and physiological references are offensive.  And to

18  do it with a 12-year-old girl, I think it would be difficult for

19  me to overstate the seriousness of this offense.

20       To promote respect for the law.  I think Mr. Nielsen has no

21  respect for the law.  And I believe if a sentence was within the

22  advisory guideline range, he could tough it out and he would be

23  right back with little or no respect for the law, seeking

24  excitement when it was available to him, consistent with the

25  psychological reports that have been done by Dr. Scolatti and

1   Ms. Bottomly.

2       Just punishment for the offense.  I don't know how one

3   measures justice in these kinds of circumstances.  I do feel

4   that punishment is a factor that must be taken into account in

5   this case.  I don't think that the punitive aspect of 235

6   months, which is almost 20 years, is adequate.  I think that 480

7   months is not greater than necessary, but it is sufficient to

8   take into account the component of 3553(a), which calls on me to

9   consider the seriousness of the offense, the punishment of

10  Mr. Nielsen and promoting a respect for the law.

11      The sentence has to deter criminal conduct.  This is a very

12  significant factor given all of what has been provided to me and

13  the knowledge that I have from the records of William Richard

14  Nielsen.  The two components of deterrence are specific

15  deterrence and general deterrence.  Specific deterrence is the

16  critical factor here.  In my view, William Richard Nielsen needs

17  to be incapacitated, and for as long as possible, in order to

18  deter him from further criminal conduct.  And I shouldn't say as

19  long as possible.  That's another one of those where he should

20  be incapacitated for a significant period of time that isn't as

21  long as possible, because I'd be putting him in prison for life,

22  but is sufficient to incapacitate him based upon all of the

23  information in this presentence investigation report and the

24  psychological reports.

25      General deterrence, in my view, is not very effective in

1  these kinds of cases.  Maybe it is, but I doubt it.  There is a

2  need to protect the public from other crimes by William Richard

3  Nielsen.  This is a very significant aspect of my view that an

4  upward variation is necessary, and that Mr. Nielsen, who is a

5  repeat sexual offender who was engaged in sexual behavior that

6  is certainly beyond the expectation of normal behavior between

7  consenting adults -- but given what adults do is one thing --

8  it's certainly, I think, and based on Dr. Scolatti's reference

9  concerning his finding that Mr. Nielsen is a moderate high risk

10  to offend without many redeeming qualities and a poor potential

11  for sustained rehabilitation, and the earlier findings of

12  Ms. Bottomly and the propensity reflected and the violence

13  characteristics that are reflected in the presentence report and

14  in psychological reports the public needs to be protected.  I

15  think that Mr. Nielsen has demonstrated by his behavior and his

16  history a willingness to get on whatever Lavalife is to use the

17  Internet to entice people, that he has the characteristic

18  described by Ms. Bottomly of being able to be -- a profile that

19  suggests a natural ability to charm, persuade or even con

20  others, coupled with numerous misanthropic attitudes.  It's, I

21  think, solidly reflected in the record there's a need to protect

22  the public from further crimes by Mr. Nielsen that are sexually

23  or violently expressed.

24      There is a need to provide him with educational,

25  vocational, medical and other correctional treatment in the most

1   effective manner.  He has completed the RDAP program, which is

2   to his benefit.  And I think Mr. Donahoe indicated that --

3   correctly so, that given the length of the sentence his

4   decision-making about participating in sex offender treatment

5   program is something that, given the fact that he is going to be

6   doing 480 months in prison, probably more effective when he gets

7   closer to the point where he would be released from prison.  He

8   does need significant treatment in my view, although

9   Dr. Scolatti indicated he did not believe that was going to be

10  very effective.

11      I have stated the kinds of sentences that are available and

12  I have also given notice that I intended to make an upward

13  variation in this case.  I have given Ms. Peterson the

14  opportunity, if she needed it, to have more time to address that

15  issue, and likewise have given Mr. Donahoe an opportunity, if he

16  wanted to address that issue, to have more time before the

17  imposition of sentence.  I think both counsel have indicated

18  that they are satisfied with the record.  And I know Mr. Donahoe

19  probably will question my judgment, but -- or the reasonableness

20  of the 480 month sentence, but I have given advance notice of

21  the intent to vary based upon on the information in Dr.

22  Scolatti's and the presentence report -- Dr. Scolatti's report

23  and the presentence report.

24      The guideline range is 188 to 235 months.  And do not

25  believe that that is sufficient.  I think it's inadequate.  It

 1  does not meet the characteristics.  I think the Congress

 2  intends, in reflecting on what is sufficient, but not greater

 3  than necessary sentence would be, for the reasons I have stated.

 4  There are no policy statements that I have found that I think

 5  would have any bearing.  And there is a need to avoid

 6  unwarranted sentence disparities among defendants with similar

 7  records who have been found guilty of similar conduct.

 8      In my 17 years, almost, on the bench, I don't recall any

 9  other person, save one, that I have imposed a sentence of the

10  magnitude for a sex offense that I am imposing on Mr. Nielsen.

11  That person, I believe, is also sentenced to 480 months or

12  something close to that.  But like Mr. Nielsen, that person had

13  a sexual background and sexual evaluations that indicated, in my

14  judgment, a risk of serious sexual offenses in the future based

15  upon sexual behavior in the past and the psychological

16  evaluations and sex offender evaluations that had been -- that

17  had taken place.

18      There is a need to provide restitution here.  And the

19  amount of $2,305 is the appropriate amount.  And as Ms. Peterson

20  indicated and Mr. Donahoe indicated, he had received notice,

21  that is for the expenses of the parents in trying to locate

22  their child, as the mother said -- or as the father said, My

23  baby, when she had left Wyoming to engage in a horrific week of

24  abuse by William Richard Nielsen.

25      Mr. Donahoe, I'm prepared to impose sentence.  If you and

1   Mr. Nielsen would approach the lectern.

2       MR. DONAHOE:   (Complies.)

3       THE COURT:  William Richard Nielsen, pursuant to the

4   authority vested in me by the Constitution of the United States

5   and the laws enacted by the Congress, as they have been

6   interpreted by the Supreme Court of the United States and the

7   Ninth Circuit Court of Appeals, I have considered your case in

8   great depth.  And I have carefully considered the reasoning set

9   forth in Judge Tashima's opinion in the case where you prevailed

10  on appeal because of my misguided application of the guidelines.

11  And I have read that over several times trying to make sure that

12  I am complying with what the circuit indicated the law was in

13  your case.  I have considered the reports of Dr. Scolatti,

14  everything that's in the presentence investigation report, all

15  of the material that had been previously submitted in this case.

16  And I have considered all of the factors of 18 U.S. Code

17  3553(a), as well as the sentencing guidelines.  And it is not

18  something that I do cavalierly, but I do believe for the reasons

19  I have stated in considering what I am supposed to consider

20  under the law.  And it is my judgment that you, William Richard

21  Nielsen, be committed to the custody of the Bureau of Prisons

22  for 480 months.  This is an upward variation from the advisory

23  guidelines.  I believe it is justified for the reasons I have

24  stated on the record.

25      I'm going to recommend that you be allowed to participate

1  in the sex offender treatment program if you go back to Tucson

2  or at any other facility you happen to reside in if you are

3  eligible.  And in the fact that you have successfully completed

4  a 500-hour residential drug treatment program, I will not

5  recommend that again.  I think they will only let you do that

6  once.

7      Mr. Nielsen, when you are released from prison you are

8  going to be placed on supervised release for the balance of your

9  life.  Within 72 hours of your release from the Bureau of

10 Prisons you report in person to the probation office in the

11 district to which you are released.

12      While you are on supervised release you're not to commit

13 another federal, state or local offense.  You shall not possess

14 any kind of controlled substance, and that includes so-called

15 medical marijuana, or any of the synthetic controlled

16 substances -- or synthetic substances that allow you to alter

17 your physical or mental state.

18      You are prohibited from owning, using or being in

19 constructive possession of firearms, ammunition or other

20 destructive or dangerous devices.  And that is for the balance

21 of your life.  If you have those things, you are committing

22 another federal offense.  You could be indicted and if

23 convicted, sentenced on those counts.

24      You're not to use controlled substances and you're going to

25 have to cooperate in the collection of DNA as directed by the

probation office.

While you're on supervised release you're going to have to
comply with the 15 standards -- conditions of supervised release
that have been adopted by the Court and recommended by the
United States sentencing guideline commission.  You need to read
those and understand them.  They will be enforced.

You will have to also comply with the following special
conditions.  You are going to have to, even in light of your
completion of the 500-hour residential drug treatment program,
you're going to have to complete a program of substance abuse
treatment as approved by the probation office and continue in
that treatment until you are relieved of the obligation by the
probation office.  You will have to pay for the treatment in
whole or part, depending upon your ability to pay.

You're going to have to participate in substance abuse
testing, and that will include not more than 104 urinalysis
tests, not more than 104 breathalyzer tests annually during the
period of your supervised release.  You will have to pay for
that in whole or part of the testing, depending upon your
ability to pay as determined by the probation office.

Mr. Nielsen, I am going to require that you abide by
standard condition number 7, with respect to the consumption of
alcohol.  And what means is that you are not to drink alcohol in
excess.  Excess is defined as a blood alcohol of point -- I
think it's point 006, if I'm correct.  It's either point 06 or

point 006.

You're going to have to participate in a program for mental
health treatment and continue in that program for assessments
for anger control.  And you will stay in that program until the
probation office releases you from that obligation.  You will
have to pay for that treatment in whole or part, depending on
your ability to pay.

I am going to require, even if you complete the sex
offender treatment program in prison, that you enter and
complete a sex offender treatment program as directed by the
U.S. probation officer in charge of your case and that you
continue in that program until you're relieved of the obligation
not only by the sex offender counselor, but also by the United
States probation officer in charge of your case.  You will have
to abide by the policies of the program, and that will include
physiological testing, polygraph and Able Assessment.  You will
have to pay for the treatment in whole or part, depending upon
your ability to pay.

Mr. Nielsen, you're going to have to consent to have all
employment be approved in advance in writing by the probation
office.  And you're going to have to consent to the third party
disclosure to any employer or potential employer of the reasons
you are here.

You're not going to be allowed to do any of the following
unless you have the prior written approval of the U.S.

1  probation office.  Now, this doesn't bar you from that.  It

2  simply means if you intend to participate or engage in any of

3  the following, before you do so you must first obtain the

4  written permission of your supervising probation office.  So

5  without that, you are not to reside in the home, residence or be

6  in the company of any child under the age of 18, with the

7  exception of your own children if you have them.  You're not to

8  go to or loiter near schoolyards, parks, playground, arcades or

9  other places primarily used by children under the age of 18.

10 You're not to date or socialize with anybody knowing they have

11 children under the age of 18, as I have indicated, without the

12 prior written approval of the U.S. Probation Office.

13      Mr. Nielsen, you are not to possess or view any materials

14 depicting sexually explicit conduct as defined in 18 U.S. Code

15 2256(2)(A) Roman one through five, including visual, auditory,

16 telephonic or electronic media, computer programs or services.

17 You are not to patronize any place where such material or

18 entertainment is the primary item of sale.  And you're not to

19 utilize 900 or adult telephone numbers or any other sex-related

20 numbers.

21      Now, based upon your use of computers and digital devices

22 to entice this 12 year old, and you also used computers or the

23 Internet and Lavalife in conjunction with the woman who acted as

24 a sex slave, you are not to possess or use any computer or other

25 device with access to any online computer service without the

1  prior written approval of your probation office.  It doesn't bar

2  you, but before you use a computer or any of those other devices

3  you have to have written approval.

4       You've got to allow the probation office to make

5  unannounced examinations of your computer, hardware and

6  software.  And that may include the retrieval and copying of all

7  data from your computer.  Again, the facts that justify this are

8  set forth in the presentence report, the manner in which you

9  contacted the victim here and others.  And the fact that you

10  actually used the Internet to obtain some contract for sex

11  slaves.

12       You're going to have to allow the probation officer to

13  install software to restrict your computer access or to monitor

14  your computer access.  And you're not to possess any encryption

15  or steganography software.  You're going to have to provide all

16  passwords, Internet service and user identifications past and

17  present to the probation officer in charge of your case.  And

18  you will have to immediately report any changes.  You will have

19  to sign releases that allow the probation office to access

20  phone, wireless, Internet and utility records.

21       You will have to comply with the sex offender registration

22  requirements for convicted offenders in any state in which you

23  live or reside.  You're going to have to submit your person and

24  any property, residence, place of employment, vehicle, papers,

25  computers as defined in 18 U.S. Code 1030(e)(1).  Other

1  electronic communications or data storage devices or media are

2  subject to search with or without a warrant, with or without

3  probable cause and with or without reasonable suspicion by any

4  law enforcement or probation officer in the lawful discharge of

5  the officer's supervisory functions.  This is justified, in my

6  view, based upon your use of the Internet for criminal behavior.

7  And this condition may include location monitoring and tracking

8  of any vehicle that you use or have access to.  You will have to

9  warn anybody living with you that the place you're living in is

10 subject to searches without reasonable suspicion pursuant to

11 this condition.  You're going to have to allow seizure of

12 suspected contraband for further examination.

13     You're not to possess any police radio scanning devices or

14 computer hardware or software that will enable you to track or

15 monitor law enforcement activities.  That includes applications

16 for digital devices or cell phones.

17     You're not to purchase, use, possess distribute or

18 administer marijuana or obtain or possess a medical marijuana

19 card or prescription.  This condition supercedes standard

20 condition number 7 with respect to marijuana only.  As I

21 mentioned earlier you're not to ingest or inhale any toxic

22 substances such as, but not limited to, synthetic marijuana

23 and/or synthetic stimulants, things like bath salts or Wet or

24 Spice.  You're not to ingest anything that is not manufactured

25 for human consumption with the purpose of altering your physical

1  or mental state.

2      You are going to be required to pay restitution in the

3  amount of $2,305 at a rate of not less than 10 percent of your

4  gross monthly income, unless otherwise directed by the probation

5  office based on your financial condition.  And restitution will

6  be made in accordance with the names set forth in the record.

7  But you will have to make the payment to the Clerk of the U.S.

8  District Court, P.O. Box 8537, Missoula, 59807.  It will be

9  disbursed to the mother and father of the child in the case with

10  their addresses as is set forth in the materials available to

11  the clerk.

12      I find you don't have the ability to pay a fine, so I'm not

13  going to impose one.  I might say that with respect to the

14  restitution, have you paid the $100 special assessment?

15      THE DEFENDANT:  I have been paying it as much as I could

16  through the job I had in Tucson.

17      THE COURT:  Well, once that's paid off, then you will

18  continue to pay at a rate not less than $25 per quarter on the

19  restitution that is ordered until that restitution is paid.  I'm

20  going to waive interest on the restitution pursuant to statutory

21  law.

22      So you will pay the $100 until it's paid off and do that

23  through the Inmate Financial Responsibility Act at a rate not

24  less than $25 per quarter.

25      Ms. Peterson, is there any legal reason why that sentence

1  as stated should not be the judgment of the Court?

2      MS. PETERSON:  No, Your Honor.

3      THE COURT:  Okay.  Well, I think there was a waiver of

4  appeal, but I think it was contingent, wasn't it?

5      MS. PETERSON:  That's correct.

6      THE COURT:  So he does have the right to appeal.

7      MS. PETERSON:  That's correct.

8      THE COURT:  Mr. Donahoe, any legal reason why the sentence

9  shouldn't be as stated by the Court?

10     MR. DONAHOE:  Your Honor, we do object to the sentence

11  based on all the records and papers in the case.  Further we

12  respectfully submit that the sentence is unreasonable.

13     THE COURT:  All right.  Your objection is noted, but the

14  sentence as stated will be the judgment of the Court.

15     Now, William Richard Nielsen, you do have a right to appeal

16  the imposition of the sentence that I just imposed.  If you

17  intend to appeal, you must file a written notice of appeal

18  within 14 days of today's date.  Do you understand that?

19     THE DEFENDANT:  Yes, sir.

20     THE COURT:  The notice of appeal has to be in writing, and

21  it has to be filed with the Clerk of the United States District

22  Court for the District of Montana.  And if you don't file the

23  notice in writing within the next 14 days with the Clerk of the

24  U.S. District Court, then you will have waived your right to

25  appeal.  Do you understand that?

```
 1        THE DEFENDANT:  Yes, sir.

 2        THE COURT:  You have a right to ask the Court to direct the

 3   Clerk to enter a notice of appeal on your behalf or you can rely

 4   on Mr. Donahoe to file the notice to appeal on your behalf.  Do

 5   you understand that?

 6        THE DEFENDANT:  Yes.

 7        THE COURT:  Do you want the Court to direct the Clerk to

 8   enter a notice of appeal on your behalf or do you want to rely

 9   on Mr. Donahoe?

10        THE DEFENDANT:  Yes.

11        THE COURT:  Okay.  That's yes to which?  Are you going to

12   rely on Mr. Donahoe?

13        THE DEFENDANT:  Rely on Mr. Donahoe.

14        THE COURT:  All right.  I will not direct the Clerk to

15   enter a notice of appeal.  Well, I'm going to remand you to the

16   custody of the United States Marshals to carry out the judgment

17   of the Court.  We will be in recess.

18        (End of proceedings.)

19

20

21

22

23

24

25
```

```
 1                      C E R T I F I C A T E

 2

 3   STATE OF MONTANA          )
                               :  ss
 4   County of Missoula        )

 5

 6       I, Jennifer Wells, Freelance Court Reporter for the State
     of Montana, residing in Missoula, Montana, do hereby certify:

 7       That I was duly authorized to and did report the testimony
     and evidence in this cause.

 8

 9       I further certify that the foregoing pages of this
     transcript represent a true and accurate transcription of my
     stenotype notes.

10

11       IN WITNESS WHEREOF, I have hereunto set my hand on this the
     17th day of December, 2012.

12

13

14

15

16

17

18
                        _____
19                      Jennifer Wells
                        Freelance Court Reporter
20                      State of Montana,
                        Residing in Missoula, Montana
21

22

23

24

25
```

JEFFRIES COURT REPORTING, INC.